IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LYNX SYSTEM DEVELOPERS, INC. and ISOLYNX, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>ZEBRA ENTERPRISE SOLUTIONS CORPORATION,<br>ZEBRA TECHNOLOGIES CORPORATION, and<br>ZIH CORP.,<br><br>Defendants. | Civil Action No. 1:15-cv-12297<br><br>**COMPLAINT FOR THE MISAPPROPRIATION OF TRADE SECRETS; BREACH OF CONTRACT; INTENTIONAL INTERFERENCE WITH EXISTING CONTRACTUAL AND ADVANTAGEOUS BUSINESS RELATIONSHIPS; BREACH OF FIDUCIARY DUTY; FRAUD; UNFAIR METHODS OF COMPETITION AND UNFAIR OR DECEPTIVE ACTS OR PRACTICES; UNJUST ENRICHMENT; CONVERSION; INTENTIONAL INTERFERENCE WITH PROSPECTIVE CONTRACTUAL AND ADVANTAGEOUS BUSINESS AND ECONOMIC RELATIONSHIPS; CORRECTION OF PATENT INVENTORSHIP; DECLARATION OF UNENFORCEABILITY FOR INEQUITABLE CONDUCT IN PATENT PROCUREMENT; AND DECLARATION OF PATENT OWNERSHIP**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Lynx System Developers, Inc. ("Lynx") and IsoLynx LLC ("IsoLynx") (collectively referred to as "Plaintiffs") hereby complain of Zebra Enterprise Solutions Corporation ("ZES") and Zebra Technologies Corporation ("ZTC") (collectively referred to as "Zebra") and ZIH Corp. ("ZIH")[1] as follows:

---

[1] ZES, ZTC, and ZIH may be collectively referred to as "Defendants."

## INTRODUCTION

1. This action arises out of unlawful schemes by Defendants to steal technological innovations for the real-time tracking of athletes and game analysis, and the market for those innovations, created and developed by Plaintiffs, over a period of many years.

2. Defendants were introduced to the real-time athlete tracking and game analysis market as a supplier of off-the-shelf components for Plaintiffs' innovations. During their dealings with Plaintiffs, which were governed by written confidentiality agreements that prohibited Defendants from using and exploiting Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how, Defendants acknowledged that: Plaintiffs had created and developed inventions, trade secrets and other proprietary and confidential information and know-how for the real-time tracking of athletes and a market for those technological innovations; Defendants lacked the technology, expertise, capabilities and know-how to provide technically sound and satisfactory solutions to customers in the real-time athlete tracking and game analysis market, such as the National Football League ("NFL") and other sports leagues; and Defendants would be able to benefit by selling their off-the-shelf components to be used in products, systems and services tor tracking athletes in real-time and for game analysis provided by Plaintiffs who had the requisite technology, expertise, capabilities and know-how.

3. Plaintiffs trusted and relied on Defendants to comply with their written confidentiality agreements with Plaintiffs; however, Defendants betrayed Plaintiffs' trust and reliance. Once Defendants realized the enormous business potential of Plaintiffs' innovations, including the market Plaintiffs created for them, Defendants embarked on elaborate schemes to cut Plaintiffs out. Defendants' schemes included getting access to details about Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how;

incorporating Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how into a commercial system, called MotionWorks™; and filing more than twenty (20) patent applications in the United States to falsely claim and unlawfully assert ownership and control of Plaintiffs' inventions, trade secrets and other confidential and proprietary information and know-how.

4. In this action, Plaintiffs seek to hold Defendants accountable for their unlawful conduct and the substantial harm they have inflicted upon Plaintiffs. This harm is ongoing, as Defendants have entered into a lucrative contract with the NFL to provide the MotionWorks™ system in all 31 NFL stadiums, and Wembley Stadium in London, for the 2015 NFL regular season.

**NATURE OF THE ACTION**

5. This is an action for: (a) misappropriation of trade secrets; (b) breach of contract; (c) intentional interference with existing contractual and advantageous business relationships; (d) breach of fiduciary duty; (e) fraud; (f) unfair methods of competition and unfair or deceptive acts or practices; (g) unjust enrichment; (h) intentional interference with prospective contractual and advantageous business and economic relationships; (i) conversion; (j) correction of inventorship of patents; (k) a declaration of unenforceability of patents based on inequitable conduct in procuring the patents; and (l) a declaration of ownership of patents.

6. Defendants have engaged in calculated and concerted actions to wrongfully obtain, use, disclose and claim as their own Plaintiffs' inventions, trade secrets, proprietary and confidential information and other valuable intellectual property rights regarding Plaintiffs' technologies to accurately track athletes on the field of play and to collect and process athlete position and biometric data in real-time in actual competition or training environments. The data, in turn, is for use by, among others, professional, collegiate and high school sports leagues

and teams, broadcasters, coaches, trainers, doctors and electronic gaming vendors for enhanced fan experience, enhanced broadcast display graphics, coaching, fitness monitoring, camera targeting, electronic video gaming and many other applications.

7. Defendants have wrongfully taken, used, disclosed, converted and attempted to own Plaintiffs' inventions, trade secrets, intellectual property rights and other proprietary and confidential information and know-how relating to Plaintiffs' customized software, firmware, and hardware components that include among other things, Plaintiffs' revolutionary data processing units, data processing algorithms and radio-frequency filters. They have engaged in wrongful actions to enter into, build and, indeed, prevent others from entering the brand new, but highly lucrative and burgeoning, business of tracking real-time athlete positioning and biometric data during competition and training and, in the process, to avail themselves of highly valuable marketing, sales and reputation benefits resulting from their ability to single-source the revolutionary real-time athlete tracking technologies to high-profile professional and collegiate teams and leagues, such as the NFL.

8. Defendants have also breached their contractual and fiduciary obligations to Plaintiffs, engaged in fraudulent acts to further and conceal their wrongful acts and intentionally and tortiously interfered with Plaintiffs' existing and prospective business relationships to corner the real-time athlete tracking business that was developed by Plaintiffs based on Plaintiffs' technologies conceived and developed by Plaintiffs' scientists and engineers.

9. Aware of the enormous value and growth potential of the newly-developed market built on the strength of Plaintiffs' innovation and resulting intellectual property rights, Defendants tried to buy Plaintiff IsoLynx to avail themselves of Plaintiffs' innovative technologies, intellectual property rights, and talented technologists to the fullest extent. After failing to do so, Defendants chose to proceed with their unauthorized and wrongful actions to

misappropriate Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how. Defendants have gone as far as trying to claim ownership of Plaintiffs' inventions, trade secrets, and other proprietary and confidential information and know-how by filing and pursuing patent applications describing and claiming Plaintiffs' inventions, knowing that Plaintiffs' engineers and scientists are the true inventors, that Plaintiffs provided the inventions to Defendants and that Plaintiffs had filed their own patent applications on their inventions before Defendants' filings of patent applications on those same inventions.

10. By this action, Plaintiffs seek to enjoin further deceitful and unlawful conduct by Defendants, to correct the consequences of Defendants' deceitful and unlawful conduct, to obtain fair compensation for the harm suffered by Plaintiffs and to hold Defendants responsible for their deceitful and unlawful conduct.

11. Plaintiffs have invested millions of dollars and tens of thousands of man-hours to invent, design, develop, test, optimize and implement a proprietary system called the "IsoLynx System," which uses ultra wide band ("UWB") radiofrequency ("RF") technology to track, among other things, the movement of athletes in sporting environments, such as football games, in real time, and to provide analytics based on the tracking data, such as where, how far and how fast a player traveled during a game. Plaintiffs' invention, design, and development of the IsoLynx System and the underlying technologies have been carried out in Massachusetts.

12. Plaintiffs overcame formidable obstacles to invent, design, and develop the technologies used in the IsoLynx System. For example, in the context of an NFL game, the UWB RF tags worn by players must be unobtrusive, but also rugged enough to withstand repetitive, high intensity impact. A successful system must simultaneously track all of the movements of the players on the field in the dynamic and fast-moving environment of the field of play, and deliver location data corresponding to each player, in real time. The location data

for each player must be accurate and continuous, even when tag transmissions are periodically obstructed by, for example, nearby players. These results must all be accomplished in the presence of high powered transmitters, such as broadcast and on-field communication equipment, that emit powerful interfering RF signals.

13. Generally, the IsoLynx System consists of tags worn by players, a general purpose tag tracking engine, a collection of hardware, software and firmware components, and know-how created, designed and developed by Plaintiffs.

14. The tags emit periodic UWB RF signals. The tags are also configured to attach to a player's shoulder pads and to withstand the rugged environment of a football game. Each player wears two tags, one on each shoulder.

15. Proprietary software tools created, designed and developed by Plaintiffs are used to manage tag installations in such a way that the emitted UWB RF signals can be properly corresponded to individual players.

16. Customized receivers are positioned around a stadium to detect the periodic UWB RF signals that are emitted from the tags. The receivers have specialized filters to eliminate interference from powerful RF interferers that are found in stadium environments.

17. A location generating engine receives data from the receivers and determines raw, real-time tag locations.

18. A processing unit uses proprietary algorithms created, designed and developed by Plaintiffs to analyze and process the raw location data of the tags into real-time, accurate and responsive location data.

19. Proprietary software created, designed and developed by Plaintiffs is used to present the location data in tabular, graphical and video formats.

20. Proprietary tools and know-how created, designed and developed by Plaintiffs are used for pre-installation planning, installation, deployment, debugging and calibration of the IsoLynx System.

21. The IsoLynx System embodies inventions, trade secrets and other proprietary and confidential information and know-how created, developed and used by Plaintiffs, including at least the following:

> customized software, firmware and hardware that include RF filters, a data processing unit and data sanitizing algorithms to produce accurate player position coordinates in real time;
>
> custom-built computers for real-time data processing, broadcast quality networking and robotic camera control;
>
> a system of interrelated filtering algorithms that work together to improve the quality and accuracy of location data determined from tracked objects;
>
> modified UWB real-time location sensors that incorporate band pass filtering to immunize against interferers;
>
> modified UWB real-time location system tags that achieve a sufficiently low profile for mounting on sporting equipment;
>
> methods for mounting UWB real-time location system tags in American football players' shoulder pads;
>
> software tools for installing, operating, diagnosing and optimizing a UWB real-time location system in sporting venues;
>
> software tools for managing the team/player/tag/settings relationships in a sporting application;
>
> methods for real-time monitoring of UWB real-time location system accuracy to ensure data integrity; and
>
> know-how related to the positioning, installation and operation of a real-time player tracking and data analysis system.

22. Plaintiffs have continuously used the IsoLynx System, including the inventions, trade secrets and other proprietary and confidential information and know-how that is the subject of this Complaint, in their business.

23. Plaintiffs entered into an arrangement with Zebra under which Zebra supplied off-the-shelf components, including a raw location generating engine, receivers and tags, for use in the IsoLynx System.

24. After developing a functional version of the IsoLynx System, Plaintiffs contacted the NFL. The NFL had previously considered alternative player tracking technologies, such as Global Positioning Systems ("GPS") and optical systems. However, those systems were unsatisfactory because, for example, they lost track of players and did not produce accurate results in real time.

25. After entering into a non-disclosure agreement with Lynx and visiting Lynx's testing facility, the NFL, specifically NFL Enterprises LLC ("NFL Enterprises"), was sufficiently impressed with the IsoLynx System to request testing of the system. Plaintiffs initially tested the IsoLynx system for the NFL at the East-West Shrine Game in Tampa, Florida on January 12, 2012.

26. Realizing the value of the IsoLynx System, the innovative technology implemented in the IsoLynx System and the business opportunity with the NFL and other sports teams and leagues, Zebra entered into confidentiality agreements with Plaintiffs to obtain access to Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how in and related to the IsoLynx System, and to align with Plaintiffs and interject itself into Plaintiffs' business opportunity with the NFL.

27. Plaintiffs thereafter tested the IsoLynx System in NFL games during the 2012 NFL preseason and regular season.

28. During the 2012 NFL season testing, IsoLynx entered into a collaboration agreement with Sportvision, Inc. ("Sportvision"), who had provided the "Virtual Yellow 1st and Ten®" line for NFL games. Under their agreement, IsoLynx and Sportvision intended to collaborate to provide to the NFL and other sports leagues an end-to-end sports tracking and media enhancement system that used the IsoLynx System to generate location tracking data and Sportvision's own tracking technologies and virtual imaging solutions (the "Sportvision System") to integrate the data into media applications.

29. At the conclusion of the 2012 NFL season testing, the NFL wanted the IsoLynx System installed in all 31 NFL stadiums for use in all NFL games during the 2013 NFL season.

30. After Plaintiffs invented and developed the IsoLynx System and demonstrated its value to the NFL, Zebra attempted to acquire Plaintiff IsoLynx.

31. After Plaintiffs rejected Zebra's low-ball acquisition offer, Zebra hatched and executed a scheme to take the IsoLynx System and the inventions and technologies used in the system for itself, and cut Plaintiffs out of the business opportunity with the NFL and other customers and business partners. Zebra also poisoned Plaintiffs' relationship with Sportvision, causing the collaboration agreement between IsoLynx and Sportvision to be terminated, and misappropriated Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how to develop and commercialize its "Zebra MotionWorks™" real-time player tracking system, which Zebra provided to the NFL to become "The Official On-Field Player-Tracking Provider of the NFL."

32. The Zebra MotionWorks™ system, which is based on Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how misappropriated by Zebra, has benefitted Zebra. For example, Zebra's 2014 annual report states that its

> partnership with the National Football League (NFL) received global recognition in 2014, as [the] Zebra MotionWorks sports solution provided real-time visibility into player performance to enhance the fan experience and enable next-gen stats and data analytics. Showcasing [the] robust solution across 17 stadiums during the regular season, plus the Pro Bowl and the Super Bowl, has led to multiple business opportunities in several industries including manufacturing and healthcare, as companies increasingly recognize the value in tracking movement of their assets in real-time.

33. Going forward, the Zebra MotionWorks™ system will continue to unjustly benefit Zebra. For example, the Zebra MotionWorks™ system will be installed and used in all 31 NFL stadiums (and Wembley Stadium in London, England for the NFL's international games) during the 2015 NFL regular season.

34. Defendants have also unlawfully misappropriated, used and disclosed Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how by incorporating them into filings submitted to the United States Patent and Trademark Office ("USPTO"), including U.S. Provisional Application No. 61/831,990, titled "Performance Analytics Based on Real-Time Data for Proximity and Movement of Objects," including Exhibits A-F ("the Zebra Provisional Application"), which was filed by ZIH on June 6, 2013, which incorporates inventions, trade secrets and other proprietary and confidential information and know-how that Plaintiffs confidentially disclosed to Zebra's personnel such as Jill Stelfox, Cynthia Traeger, Ed Richley and Belinda Turner, and which names Zebra personnel as "inventors" of these innovations and technologies claimed and described in the patent application.

35. Since that time, ZIH has filed numerous patent applications that claim priority based on the Zebra Provisional Application. To date, ZIH has obtained two U.S. patents based on the Zebra Provisional Application, including U.S. Patent No. 8,989,880 ("the '880 patent"), filed July 15, 2013, and issued March 24, 2015, and U.S. 9,002,485 ("the '485 patent"), also

filed July 15, 2013, and issued April 7, 2015. The ‘880 patent and the ‘485 patent both identify ZIH as the applicant and assignee on the face of the patent.

36. By filing patent applications that contain Plaintiffs’ inventions, trade secrets and other proprietary and confidential information and know-how related to the innovations and technologies used in the IsoLynx System without identifying Plaintiffs’ employees who are true inventors of these inventions as named inventors in the Zebra Provisional Application, Defendants have engaged in a scheme to attempt to claim as their own intellectual property Plaintiffs’ inventions, trade secrets and other proprietary and confidential information and know-how, and, notwithstanding their duties of candor, falsely represented to the United States Patent and Trademark Office (“USPTO”) that Defendants’ employees had created, developed and own Plaintiffs’ inventions, trade secrets and other proprietary and confidential information and know-how, with the full knowledge that it was Plaintiffs’ employees who were the true inventors of these inventions and technologies and that Plaintiffs are the rightful owners of any resulting patent rights from the patent applications.

## THE PARTIES

37. Lynx System Developers, Inc. (“Lynx”) is a corporation organized and existing under the laws of the Commonwealth of Massachusetts, with its principal place of business at 179 Ward Hill Avenue, Haverhill, Massachusetts 01835. From Massachusetts, Lynx creates, develops, makes, markets and sells digital “photo finish” technology and fully automatic timing systems, line-scan cameras and athlete tracking technology for sports markets across the world under the names “Lynx” and “FinishLynx.”

38. Lynx was founded in 1992 by President and Chief Technology Officer Doug DeAngelis. Mr. DeAngelis has a Bachelor’s Degree in Electrical Engineering from the University of Maine, where he competed in cross country and indoor and outdoor track. Mr.

DeAngelis also has a Master's Degree in Electrical Engineering and Computer Science from MIT. As a long-time runner, DeAngelis saw an opportunity to use digital line-scan technology to produce more accurate and precise photo finish results for sports, which led him to create, develop and commercialize the Lynx and FinishLynx technologies. The Lynx and FinishLynx technologies are used at major sporting events across the world, including the Olympic Trials, the Kentucky Derby, NASCAR races, and the Tour de France.

39. IsoLynx LLC ("IsoLynx") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 179 Ward Hill Avenue, Haverhill, Massachusetts 01835. IsoLynx began in 2005 as a business unit of Lynx to create, develop and commercialize real-time player tracking technology. The IsoLynx business unit was overseen by Mr. DeAngelis and Lynx's CEO, Ed Evansen. Mr. Evansen joined Lynx in 2003, after co-founding and serving as CEO of Measurement Computing Corporation in Norton, Massachusetts. He has a Bachelor's Degree in Electrical Engineering and an MBA in Business Technology from Northeastern University.

40. Lynx formed IsoLynx on November 23, 2009. Lynx was the sole member and manager of IsoLynx. On September 24, 2010, Lynx assigned the assets of the IsoLynx business unit to IsoLynx. As part of that transaction, Lynx appointed Mr. Evansen as CEO and he became a member of IsoLynx. Lynx remained as a member and the sole manager of IsoLynx and retained majority ownership and control over IsoLynx, including the right to negotiate and enter into agreements, and to take any other actions with respect to IsoLynx and its assets. Lynx employees perform work for IsoLynx, and Lynx pays the employees for their work.

41. Zebra Enterprise Solutions Corporation ("ZES") is a corporation organized and existing under the laws of the State of California with its principal place of business at 2940 North First Street, San Jose, California 95113.

42. ZES is a wholly owned subsidiary of Zebra Technologies Corporation.

43. ZES engaged in activities that give rise to the claims brought by Plaintiffs in this suit.

44. Zebra Technologies Corporation ("ZTC") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 475 Half Day Road, Suite 500, Lincolnshire, Illinois 60069.

45. ZTC engaged in activities that give rise to the claims brought by Plaintiffs in this suit.

46. ZIH Corp. ("ZIH") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 475 Half Day Road, Suite 500, Lincolnshire, Illinois 60069.

47. ZIH is a wholly owned subsidiary of Zebra Technologies Corporation.

48. ZIH is the assignee of patent applications that were unlawfully filed and that give rise to the claims brought by Plaintiffs in this suit.

**JURISDICTION AND VENUE**

49. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) with respect to Counts X, XI and XII because they arise under the Patent Act, 35 U.S.C. § 1, et seq.; 28 U.S.C. § 2201(a) with respect to Counts X, XI and XII because they seek declarations of rights and other legal relations arising under the Patent Act, 35 U.S.C. § 1, et seq.; 28 U.S.C. § 1338(b) with respect to Count VI because it is a claim for unfair competition that is related to Counts X, XI and XII; and 28 U.S.C. § 1367(a) with respect to Counts I-IX because they are so related to Counts X, XI and XII that they form part of the same case or controversy under Article III of the United States Constitution.

50. This Court has personal jurisdiction over Defendants based on tortious acts committed by Defendants in the Commonwealth of Massachusetts that are the subject of this suit. Defendants have established at least minimal contacts with the Commonwealth of Massachusetts such that they should reasonably and fairly anticipate being brought into court in the Commonwealth of Massachusetts. Furthermore, ZES and ZTC are registered to do business and have conducted business in the Commonwealth of Massachusetts, and they have purposefully reached out to residents of the Commonwealth of Massachusetts by promoting, providing and using their products and services in the Commonwealth of Massachusetts, including the Zebra MotionWorks™ real-time player tracking system. In addition, Defendants have visited Plaintiffs and Plaintiffs' facilities in Massachusetts, attended the confidential demonstrations of Plaintiffs' technologies and disclosures to Defendants of Plaintiffs' inventions, trade secrets, confidential and proprietary information, know-how and other intellectual property in Massachusetts, and regularly and systematically communicated with Plaintiffs and Plaintiffs' employees located in Massachusetts in connection with Defendants' dealings with Plaintiffs that form the basis for this Complaint, including seeking and obtaining access to Plaintiffs' inventions, trade secrets, confidential and proprietary information, know-how and other intellectual property.

51. Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district, and a substantial part of the property that is the subject of this suit is located in this judicial district. For example, Plaintiffs are located in this judicial district, the IsoLynx System was invented, developed, tested and demonstrated in this judicial district, Defendants have visited Plaintiffs and Plaintiffs' facilities in this judicial district, Defendants have attended the confidential demonstrations of Plaintiffs' technologies and disclosures to Defendants of

Plaintiffs' inventions, trade secrets, confidential and proprietary information, know-how and other intellectual property in this judicial district, and Defendants have regularly and systematically communicated with Plaintiffs and Plaintiffs' employees located in this judicial district in connection with Defendants' dealings with Plaintiffs that form the basis for this Complaint.

**ADDITIONAL FACTS**

52. In 2004, Lynx initiated a project called IsoLynx to develop a real-time player tracking and data analysis system. Lynx invested approximately $24,000 to purchase a UWB RF identification ("RFID") system, called the "Sapphire Dart," from Multispectral Solutions, Inc. ("MSSI") for use in the IsoLynx project. The "Sapphire Dart" system was used to track personnel, inventory, equipment and parts in factories, warehouses and the like. Generally, the Sapphire Dart system consisted of asset tags, reference tags, receivers and a receiver interface that received signals from the tags and used algorithms to determine the positions of the asset tags. Lynx used components of the Sapphire Dart system for its IsoLynx project.

53. In April 2008, ZTC acquired MSSI.

54. At the time ZTC acquired MSSI, Zebra had no experience with creating, developing, making, marketing or selling real-time tracking systems for sports applications.

55. Although Zebra sold the Sapphire Dart system for a time after ZTC's acquisition of MSSI, Zebra ultimately upgraded the Sapphire Dart system, which it began marketing and selling under the name "Dart."

56. Like the Sapphire Dart system, the Zebra Dart system was designed for tracking semi-stationary or slow moving objects, such as equipment in hospitals, containers in warehouses and livestock in a field, with a relatively coarse degree of accuracy.

57. Like the Sapphire Dart system, the Zebra Dart system was inadequate for use in real-time tracking systems for sports applications, such as tracking fast-moving athletes on a dynamic field of play in an NFL stadium environment.

**The ZES-Lynx Solutions Agreement**

58. On or about September 30, 2009, Lynx entered into a Solutions Agreement with ZES (the "ZES-Lynx Solutions Agreement").

59. Under the ZES-Lynx Solutions Agreement, Lynx purchased Zebra Dart components, including asset tags, receivers and high speed processing hubs, for use in the IsoLynx System.

60. Lynx and ZES contemplated and understood that Lynx would incorporate Zebra Dart components purchased under the ZES-Lynx Solutions Agreement into the IsoLynx System.

61. ZES drafted the ZES-Lynx Solutions Agreement.

**The ZES-Lynx OEM Agreement**

62. On or about December 22, 2009, Lynx and ZES entered into an OEM Agreement (the "ZES-Lynx OEM Agreement").

63. As under the ZES-Lynx Solutions Agreement, under the ZES-Lynx OEM Agreement, Lynx purchased Zebra Dart components, including asset tags, receivers and high speed processing hubs, for uses in the IsoLynx System.

64. Lynx and ZES contemplated and understood that Lynx would incorporate Zebra Dart components purchased under the ZES-Lynx OEM Agreement into the IsoLynx System.

65. ZES drafted the ZES-Lynx OEM Agreement.

**The Lynx-NFL Enterprises Nondisclosure Agreement**

66. On August 19, 2010, Lynx and NFL Enterprises LLC ("NFL Enterprises") entered into a Nondisclosure Agreement (the "Lynx-NFL Enterprises NDA") "[i]n connection

with discussions and/or negotiations between [Lynx and NFL Enterprises LLC] regarding enhanced statistical data from NFL games."

67. Under the Lynx-NFL Enterprises NDA, Lynx confidentially disclosed information about the IsoLynx System to NFL Enterprises so that NFL Enterprises could consider an arrangement where it would use the IsoLynx System to track players in real time during NFL games and generate statistical data that would be owned and potentially licensed or sold to third parties by NFL Enterprises.

68. Zebra was aware of the Lynx-NFL Enterprises NDA.

69. Zebra was aware of Plaintiffs' dealings with NFL Enterprises under the Lynx-NFL Enterprises NDA.

70. Under the Lynx-NFL Enterprises NDA, Plaintiffs tested the IsoLynx System at the New England Patriots' practice facility in Foxborough, Massachusetts on October 5-7, 2010. The testing went well, and NFL Enterprises showed an interest in entering into an arrangement where it would obtain rights to use the IsoLynx System to obtain statistical data on NFL players.

71. Following the testing on October 5-7, 2010, Plaintiffs continued to develop the IsoLynx System.

72. In October 2011, NFL Enterprises contacted Plaintiffs regarding the status of the IsoLynx System. On October 6, 2011, Plaintiffs demonstrated the IsoLynx System to NFL Enterprises at Andover (Massachusetts) High School under the Lynx-NFL Enterprises NDA. Two employees of NFL Enterprises – Noah Fischbach, Vice President, Emerging Products & Technology and Vishal Shah, Vice President, Digital Media – attended the demonstration. The demonstration went well, and NFL Enterprises again expressed interest in obtaining rights to use the IsoLynx System to obtain statistical data on NFL players.

73. On November 10, 2011, Messrs. Fischbach and Shah visited Lynx's offices in Haverhill, Massachusetts to obtain additional information, including proprietary and confidential technical and financial information, about the IsoLynx System. Plaintiffs confidentially provided this information to Messrs. Fischbach and Shah under the Lynx-NFL Enterprises NDA.

74. The NFL thereafter requested a game day test of the IsoLynx System. That test was conducted in connection with the 2012 East-West Shrine Game in Tampa, Florida.

75. At the 2012 East-West Shrine Game test, the IsoLynx System did not function as intended because RF transmissions from wireless broadcast cameras and other sources in the stadium interfered with the Zebra Dart receivers that were used in the IsoLynx System.

76. Plaintiffs contacted ZES regarding the RF interference with the Zebra Dart receivers experienced at the 2012 East-West Shrine Game test.

77. In response, ZES indicated that the Zebra Dart receivers could not operate in the presence of powerful RF interferers.

78. ZES suggested that the only way to avoid RF interference with the Zebra Dart receivers was to remove the RF interferers from the environment. Neither ZES nor any other Zebra company was able to offer any technical solution to allow the Zebra Dart receivers to operate properly in televised NFL or other sports games where wireless broadcast cameras are used.

79. Because wireless broadcast cameras are one of the powerful RF interferers in an NFL stadium, ZES's suggestion to remove the interferers (i.e., wireless broadcast cameras) was not viable.

80. To address the inability of Zebra Dart receivers to operate properly in the presence of powerful RF interference, a huge road block to successful commercialization and market acceptance of the technologies as identified by the 2012 East-West Shrine Game test of

the IsoLynx System, Plaintiffs, without any technical input from Defendants, engineered a proprietary and confidential solution that allowed the faint signals of the asset tags to be detected in the hostile RF environment common in game-day NFL stadiums. Plaintiffs' solution uses, among other things, a specialized band pass filter that blocks the powerful RF signals from interfering devices but allows a faint UWB RF tag signal to pass through. Plaintiffs' solution was highly effective and allowed the IsoLynx System to work in the actual game environments. To accomplish this solution, Plaintiffs spent substantial monetary and other resources to purchase specialized test equipment, rented interfering RF equipment and did laborious and time-consuming iterative testing of the IsoLynx System in the presence of the RF interferers.

**The Lynx-ZES Mutual Confidentiality Agreement**

81. Zebra became interested in the array of proprietary and confidential software tools and firmware algorithms Plaintiffs had developed to install, calibrate and operate the IsoLynx System and requested access to them.

82. On February 17, 2012, Lynx and ZES entered into a Mutual Confidentiality Agreement (the "Lynx-ZES Mutual Confidentiality Agreement") "to explore the possibility of a collaborative business relationship with one another." (Exhibit A to the Complaint, "Purpose" Section.)

83. The collaborative business relationship envisioned by Lynx and ZES and as set forth in the Lynx-ZES Mutual Confidentiality Agreement was for Lynx to use Zebra's Dart components to provide location information for the IsoLynx System.

84. ZES drafted the Lynx-ZES Mutual Confidentiality Agreement.

85. The Lynx-ZES Mutual Confidentiality Agreement "sets forth the entire agreement of the parties concerning the subject matter hereof and supersedes all prior agreements, understandings and negotiations between the parties regarding such subject matter."

86. The Lynx-ZES Mutual Confidentiality Agreement defined "Confidential Information" as

> information (including formulae, patterns, compilations, programs, devices, methods, techniques and processes) provided by either party to the other, that derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and includes, without limitation, (a) each party's software and other products and works in progress (including computer software, manuals, and all other materials associated with the use of the software) as well as all intellectual property rights associated therewith (including computer software, manuals, and all other materials associated with the use of the software) as well as all intellectual property rights associated therewith (including associated with functionality, programming techniques, interface elements, data manipulation and management methods and formulae represented in, or demonstrated by the use of, such software products); and (b) information relating to each party's business affairs, internal operations, personnel, financial matters, technology, research and development, product plans or offerings, markets, sales opportunities, or know-how; and (c) any of the foregoing information belonging to an affiliate of ZES that ZES may disclose to Company ….

87. The IsoLynx System and the technologies and innovations developed and implemented in the IsoLynx System by Plaintiffs and the details of Plaintiffs' dealings with and prospective business and economic relationship with the NFL fell within the definition of "Confidential Information" set forth in the Lynx-ZES Mutual Confidentiality Agreement.

88. In the Lynx-ZES Mutual Confidentiality Agreement, ZES agreed to "maintain and preserve the confidentiality of [Lynx's] Confidential Information"; to "disclose [Lynx's] Confidential Information to only those of its employees, independent contractors and/or advisors who are bound by written agreement or professional obligation to preserve the confidentiality of such Confidential Information upon terms substantially in conformance with the terms of [the Lynx-ZES Mutual Confidentiality Agreement]"; and to "use [Lynx's] Confidential Information solely in connection with evaluating whether to engage in a collaborative business relationship with [Lynx] and in pursuit of the purposes of such relationship."

89. Furthermore, ZES agreed that it "shall not otherwise use or exploit [Lynx's] Confidential Information for its own benefit or purposes, or for the benefit or purposes of any third party."

90. The term of the Lynx-ZES Mutual Confidentiality Agreement extended until "the conclusion of the parties' proposed collaborative business relationship, unless sooner terminated by either party upon thirty (30) days advance written notice."

91. In the Lynx-ZES Mutual Confidentiality Agreement, "[t]he obligations of confidentiality and limited use… survive for a period of five (5) years from the date of such termination."

92. The Lynx-ZES Mutual Confidentiality Agreement further states that

> Each party agrees that money damages would be inadequate compensation for breach of th[e] Agreement. Accordingly, each party hereby consents in advance to the entry of equitable relief by a court of competent jurisdiction (including an injunction that enjoins the breaching party from disclosing or using the Disclosing Party's Confidential Information) to enforce the terms hereof. Such remedies are in addition to any other remedies available at law or equity.

93. Thereafter, and pursuant to the Lynx-ZES Mutual Confidentiality Agreement, Plaintiffs disclosed to Zebra, inventions, trade secrets and other proprietary and confidential information and know-how related to the design, structure, function, operation and capabilities of the IsoLynx System, the technologies and innovations used and implemented in the IsoLynx System, and the business opportunity with the NFL.[2]

94. On February 21, 2012, Belinda Turner and Bill Bulzoni of Zebra visited Lynx's facilities. At this time, Ms. Turner was Director of RFID Engineering – RTLS ("RFID" is an

---

[2] Hereinafter, the IsoLynx System, the inventions, trade secrets and other proprietary and confidential information and know-how embodied therein, and Plaintiffs' dealings with and prospective business relationship with the NFL may be referred to collectively as "Protected Information."

acronym for radio frequency identification and "RTLS" is an acronym for real time location systems), and Mr. Bulzoni was Director, RFID –Business Development.

95. During the February 21, 2012 meeting with Ms. Turner and Mr. Bulzoni, Plaintiffs disclosed inventions, trade secrets and proprietary and other confidential information and know-how related to the IsoLynx System and details of their business opportunity with the NFL.

96. Plaintiffs' disclosures to Ms. Turner and Mr. Bulzoni at the February 21, 2012, meeting was made under the Lynx-ZES Mutual Confidentiality Agreement.

97. At the February 21, 2012, meeting, Ms. Turner and Mr. Bulzoni indicated that they were very impressed with the IsoLynx System and requested a follow-up meeting.

98. On February 28, 2012, Plaintiffs participated in a Web meeting with Ms. Turner during which Plaintiffs provided additional inventions, trade secrets and other proprietary and confidential information and know-how related to the IsoLynx System.

99. Plaintiffs' disclosure of its trade secrets and proprietary and confidential information during the February 28, 2012, Web meeting with Ms. Turner was made pursuant to the Lynx-ZES Mutual Confidentiality Agreement.

100. Following the February 28, 2012, Web meeting, Ms. Turner contacted Mr. Evansen of Plaintiffs and stated that she, as Zebra's Director of RFID Engineering, was extremely impressed and excited about the IsoLynx System and its technologies and that she had never seen anything like the IsoLynx System and its capabilities. Ms. Turner also told Mr. Evansen that Zebra needed to have access to the IsoLynx System and its technologies.

101. In follow-up conversations arranged by Zebra under the Lynx-ZES Mutual Confidentiality Agreement, Plaintiffs confidentially disclosed additional trade secrets and other proprietary and confidential information and know-how about the IsoLynx System to Zebra

engineers and management, including Plaintiffs' modifications to off-the-shelf Dart tags, details about the improved band pass filters Lynx had developed for use in the IsoLynx System and functional capabilities of the IsoLynx System.

102. Zebra personnel attended Plaintiffs' testing of the IsoLynx System during the December 23, 2012 NFL regular season game between the Miami Dolphins and the Buffalo Bills at Sun Life Stadium in Miami.

103. At the December 23, 2012, NFL regular season game at Sun Life Stadium in Miami, Zebra personnel obtained additional trade secrets and other proprietary and confidential information and know-how about the IsoLynx System and about the business opportunity with the NFL under the Lynx-ZES Mutual Confidentiality Agreement.

**The Lynx-Sportvision NDA**

104. In March 2012, Plaintiffs contacted Sportvision regarding a potential collaboration in which the IsoLynx System would be integrated with Sportvision's virtual imaging technology to provide an end-to-end player tracking and virtual imaging solution for NFL games.

105. On March 7, 2012, Lynx and Sportvision entered into a Nondisclosure Agreement (the "Lynx-Sportvision NDA") "[i]n connection with discussions and/or negotiations between the Parties regarding how they can work together to provide Real Time Player and Object Tracking using RF Technology and a demonstration of Lynx's RF Real Time Player and Object Tracking System."

106. The Lynx-Sportvision NDA stated:

> The demonstration of Lynx's RF Real Time Player and Object Tracking System will include describing and demonstrating the logistics, deployment and performance of Lynx's RF Real Time Player and Object Tracking System from a user's point of view. Lynx shall not disclose to Sportvision under this Agreement, and will not receive any protection under this Agreement for, any

source code, schematic diagrams or other engineering documents for Lynx's RF Real Time Player and Object Tracking System.

107. The original term of the Lynx-Sportvision NDA was six months from March 7 2012, but the term was extended twice – first to October 22, 2012, and then to November 15, 2012.

108. On May 7, 2012, Plaintiffs successfully demonstrated the IsoLynx System to Sportvision at Andover (Massachusetts) High School under the Lynx-Sportvision NDA.

109. Zebra was aware of the Lynx-Sportvision NDA and Plaintiffs' dealings with Sportvision under the Lynx-Sportvision NDA.

**Testing of the IsoLynx System and the IsoLynx-Sportvision Collaboration Agreement**

110. From July 24, 2012, to August 4, 2012, Plaintiffs, NFL Enterprises and Sportvision tested the IsoLynx System with integrated Sportvision virtual imaging technology at Sun Life Stadium in Miami under the Lynx-NFL Enterprises NDA and the Lynx-Sportvision NDA. On July 24, 2012, Sun Life Stadium was surveyed, and the integrated IsoLynx System/Sportvision visual imaging technology was installed in the stadium on August 1-2, 2012. On August 3, 2012, the integrated IsoLynx System/Sportvision visual imaging technology was tested in the vacant stadium. The integrated IsoLynx System/Sportvision visual imaging technology was further tested on Miami Dolphins players during a scrimmage on August 4, 2012.

111. The July 24 to August 4, 2012, testing in Miami went well, and NFL Enterprises requested additional tests for the Miami Dolphins' two home preseason games on August 10 and August 24, 2012, and the Miami Dolphins' first home game of the regular season on September 16, 2012.

112. During the Miami Dolphins' August 10, 2012, preseason game, Plaintiffs tested whether the IsoLynx System would interfere with stadium game-day systems and whether the IsoLynx System would provide accurate information throughout a game. Although no players were tagged, tags were placed around the perimeter of the field. The testing was successful.

113. Following the August 10, 2012, preseason game, Plaintiffs experimented with re-works of the tags to achieve a smaller overall profile and stable and robust mechanics to withstand the rigors of an NFL game with Zebra's knowledge, consent and encouragement. This experimentation was a time-consuming, trial and error process. After many iterations and field tests, Plaintiffs developed modified tags that met the NFL's requirements of a smaller overall profile, a water resistant assembly and suitable mechanics.

114. In the August 24, 2012, preseason game, a limited number of football players were tagged, with two players wearing tags that had been reworked by Plaintiffs specifically for use in American football. The testing was successful.

115. Following the August 24, 2012, preseason game, Plaintiffs continued their development and testing of re-worked tags and improved hardware band pass filters for integration into Zebra receivers. For example, Plaintiffs rented a broadcast camera transmitter to simulate the radiofrequency environment in NFL stadiums and compared the performance of Zebra receivers with and without the hardware band pass filters. This testing showed that the receivers with the improved hardware band pass filters worked, while the "off-the-shelf" receivers without the improved hardware band pass filters did not work.

116. On or around September 5 and 6, 2012, and pursuant to the Lynx-ZES Mutual Confidentiality Agreement, Plaintiffs reported the results of their testing to Zebra. In a September 5, 2012, email to Belinda Turner and Ed Richley of Zebra, Ed Evansen of Plaintiffs stated:

> We have just completed stadium level system testing incorporating our new bandpass filters to deal with wireless broadcast cameras and other high powered interferers. We can now withstand wireless camera transmitter units in the environment. If you recall, any wireless camera in the environment would cause all receivers to peg and completely paralyze the system. With our bandpass filters installed the system performance is identical with wireless cameras on/off.

117. In response to Mr. Evansen's September 5, 2012, email, Ms. Turner of Zebra acknowledged the difficulty in immunizing the Zebra receivers from RF interferers, the inability of Zebra to provide a technical solution to the problem and to achieve the desired outcome, and requested further details on Plaintiffs' solutions to the problem.

118. In response to Ms. Turner, Mr. Evansen provided further details to Zebra under the Lynx-ZES Mutual Confidentiality Agreement.

119. During the Miami Dolphins' first home regular season game on September 16, 2012, 31 Dolphins players were tagged. The testing used new firmware filter algorithms conceived, created and developed by Plaintiffs and receivers with hardware band pass filters. The testing was successful. As a result, NFL Enterprises requested that testing of the IsoLynx System continue at Sun Life Stadium for the remainder of the NFL's 2012 regular season.

120. On September 27, 2012, Mr. Evansen met with Ms. Turner and other Zebra engineers, including Santiago Romero, Product Manager, and Ed Richley, Chief Scientist – RTLS.

121. During the September 27, 2012, meeting, Mr. Evansen confidentially disclosed to Ms. Turner and Messrs. Romero and Richley trade secrets and other proprietary and confidential information and know-how related to the IsoLynx System.

122. During the September 27, 2012, meeting, Mr. Evansen showed Ms. Turner and Messrs. Romero and Richley how the IsoLynx System worked and the proprietary technologies used in the system, including the latest anti-jitter and reality filtering algorithms; Plaintiffs'

combined hardware/software solution for managing the player tagging process using the Tag Manager running on a mobile platform; and the methods Plaintiffs used for system redundancy, including automated RJ45 switching banks to replace bad system elements, such as receivers and processing hubs, in real time.

123. During the September 27, 2012, meeting with Ms. Turner and Messrs. Romero and Richley, Mr. Evansen also provided detailed descriptions of how proprietary and confidential IsoLynx software tools were used to determine the most appropriate locations for various IsoLynx System elements and the proprietary and confidential IsoLynx tools used for adjusting and optimizing field coverage, identifying and dealing with environmental issues and balancing load to maximize overall system bandwidth.

124. Mr. Evansen's disclosure of information to Ms. Turner and Messrs. Romero and Richley at the September 27, 2012, meeting was made under and was governed by the Lynx-ZES Mutual Confidentiality Agreement.

125. At the request of Ms. Turner and Messrs. Romero and Richley, Mr. Evansen provided some of the same trade secret and other proprietary and confidential information and know-how that was disclosed at the September 27, 2012, meeting to Tim Harrington, Zebra's Vice President, Product Management – RTLS.

126. Mr. Evansen's disclosure of information to Mr. Harrington at the request of Ms. Turner and Messrs. Romero and Richley was made under and was governed by the Lynx-ZES Mutual Confidentiality Agreement.

127. The information provided to Mr. Harrington by Mr. Evansen was for Mr. Harrington's use at a Zebra internal, confidential presentation to Zebra's senior management.

128. Plaintiffs subsequently developed and integrated filtering algorithms into the IsoLynx System. These algorithms enhanced the anti-jitter and reality filtering algorithms by causing the real-time output data to appear more "natural."

129. On October 24, 2012, under the Lynx-ZES Mutual Confidentiality Agreement, Mr. Evansen provided Mr. Romero with additional trade secrets and other proprietary and confidential information for the design of tags to track players and objects (such as footballs). Mr. Romero requested this information to prepare himself and other Zebra technical staff for a conference call that same day.

130. During a conference call on October 24, 2012, with Mr. Romero and other Zebra technical staff, Mr. Evansen described Plaintiffs' tag designs, including designs to attach tags to shoulder pads, in detail.

131. Mr. Evansen's disclosures during the October 24, 2012, conference call with Mr. Romero and other Zebra technical staff were made under and were governed by the Lynx-ZES Mutual Confidentiality Agreement.

132. On October 25, 2012, Mr. Romero informed Mr. Evansen that Mr. Harrington's internal presentation about the IsoLynx System had sparked significant interest in the IsoLynx System within Zebra's senior management.

133. At the request of Mr. Bulzoni of Zebra, from October 29, 2012, to November 7, 2012, Mr. Evansen and Lynx's Director of Marketing, Giles Norton, helped Mr. Bulzoni prepare a confidential Briefing Deck for Jill Stelfox, the new Vice President and General Manager of Zebra's RTLS division.

134. The information provided by Messrs. Evansen and Norton to Mr. Bulzoni from October 29, 2012, to November 7, 2012, and incorporated into the confidential Briefing Deck for

Ms. Stelfox was provided under and governed by the Lynx-ZES Mutual Confidentiality Agreement.

135. The confidential Briefing Deck of Zebra acknowledges that the IsoLynx System used "customized software, firmware, and hardware that includes RF filters, an IsoLynx data processing unit, and Lynx-developed data sanitizing algorithms," and that "the IsoLynx solution produces accurate Player position coordinates in Real Time."

136. Furthermore, the confidential Briefing Deck includes an "IsoLynx Solution Overview" that shows how the IsoLynx System is set up in a stadium; an "IsoLynx Solution Vision" that shows Plaintiffs' modifications to the Zebra receivers and tags and the IsoLynx "customized 19" rack-mount housing containing custom built computers for Real Time data processing, broadcast quality networking, and robotic camera control."

137. The confidential Briefing Deck states that the "Intent of Lynx and Zebra" is: "To create a strategic partnership whereby Zebra's Dart UWB technology provides location information that enables Lynx System Developers IsoLynx solution."

138. The confidential Briefing Deck refers to "Direct" and "Indirect" monetary and non-monetary benefits, including "[m]arketing and PR benefits provided by NFL relationship."

139. The confidential Briefing Deck also includes photos of the modified tags Lynx developed for use in the IsoLynx System.

140. On November 11, 2012, all of the Miami Dolphins players were tagged for their game against the Tennessee Titans. Plaintiffs used their updated firmware filtering algorithms in connection with the tags that were used. The testing was successful.

141. On or around November 15, 2012, the confidential Briefing Deck was presented to Ms. Stelfox and other Zebra senior management.

142. Mr. Bulzoni reported to Mr. Evansen that the presentation of the confidential Briefing Deck to Ms. Stelfox was well received.

143. On November 27, 2012, and pursuant to the Lynx-NFL Enterprises NDA, Plaintiffs tested their tag management system on the shoulder pads used by all of the football players at the New England Patriots' equipment facility in Foxborough, Massachusetts. Plaintiffs used their newly developed, proprietary and confidential tag management software to automate the installation of tags and to create the necessary team/player/tag association files. The testing was successful.

144. On December 1, 2012, IsoLynx entered into a Collaboration Agreement with Sportvision (the "IsoLynx-Sportvision Collaboration Agreement").

145. In connection with the IsoLynx-Sportvision Collaboration Agreement, IsoLynx and Sportvision had "collaborated on the development and marketing of a seamless end-to-end tracking and data generation system that integrates the IsoLynx System and the Sportvision System into an 'Integrated System'…that can deliver real-time sports tracking data, power coaching solutions and media applications, and have been successfully testing the Integrated System in NFL games[.]" Furthermore, under the IsoLynx-Sportvision Collaboration Agreement, the parties intended "for Sportvision to act as IsoLynx's exclusive marketing and sales conduit in certain professional sports and territories, and IsoLynx will act as Sportvision's exclusive partner to track athletes in specific sports[.]"

146. The IsoLynx-Sportvision Collaboration Agreement describes the "IsoLynx Tracking System Components and Infrastructure," including "Standard" and "Modified" active tags for players and/or objects; "[t]ags for system reference calibration"; "Standard" and "Enhanced" UWB receivers; and the "IsoLynx Positioning Tracking Unit" that "[c]onnects to all UWB receivers, computes tag position data from raw receiver data, performs algorithm based

filtering and modeling, and outputs conditioned position data in response to an internal or external output trigger mechanism event." The IsoLynx-Sportvision Collaboration Agreement also protected the confidentiality of and Plaintiffs' intellectual property rights related to the IsoLynx System.

147. Zebra was aware of the IsoLynx-Sportvision Collaboration Agreement.

148. Zebra was aware of Plaintiffs' dealings with Sportvision and NFL Enterprises in connection with the IsoLynx-Sportvision Collaboration Agreement.

149. On December 2, 2012, and under the Lynx-NFL Enterprises NDA, Plaintiffs tested the IsoLynx System on every player on both teams in a game between the Miami Dolphins and the New England Patriots at Sun Trust Stadium in Miami. This was the first NFL game in which every player was tagged. Plaintiffs used their newly developed, proprietary and confidential firmware filtering algorithms. The testing was hugely successful, and NFL Enterprises indicated that it wanted to move forward with a plan to use the IsoLynx System in all 31 NFL stadiums and in every game of the NFL's 2013 regular season.

150. After the December 2, 2012, NFL game, Plaintiffs sent their modified tags to Zebra for an engineering evaluation that would evaluate the signal transmission from the tags to see if Plaintiffs' modifications compromised tag transmission characteristics.

151. Plaintiffs sent their modified tags to Zebra for engineering evaluation after the December 2, 2012 NFL game pursuant to the Lynx-ZES Mutual Confidentiality Agreement.

152. On December 16, 2012, Plaintiffs tested the IsoLynx System at an NFL game between the Miami Dolphins and the Jacksonville Jaguars at Sun Trust Stadium in Miami. All of the players on both teams were tagged, and the testing was successful.

153. On December 19, 2012, at the request of NFL Enterprises under the Lynx-NFL Enterprises NDA, Plaintiffs used their proprietary and confidential technology to create player

statistics, including player identification, the number of plays per player and yards traveled on per-quarter and per-game bases, from the data obtained from the IsoLynx System during the previous NFL games. NFL Enterprises verified that these statistics were 100% correct.

154. Thereafter, NFL Enterprises indicated to Plaintiffs that it wanted to replace its Game Statistics & Information System. Accordingly, NFL Enterprises asked Plaintiffs to use their proprietary and confidential software to produce reports of NFL games that included each game broken down into individual drives; each drive broken down into individual plays; the distance traveled by each player on each play; the maximum velocity of each player on each play; the distance traveled by each player while on the field; video clips for specific plays; and quarter and game summaries for both teams. From December 20, 2012, to mid-February 2013, Plaintiffs performed these tasks under the Lynx-NFL Enterprises NDA.

155. Zebra was aware of Plaintiffs' aforementioned activities with respect to the production of reports of NFL games, which were performed from December 20, 2012, to mid-February 2013.

156. On December 23, 2012, Plaintiffs tested the IsoLynx System, with Sportvision virtual imaging technology, under the Lynx-NFL Enterprises NDA during a game between the Miami Dolphins and the Buffalo Bills at Sun Trust Stadium in Miami. Only the Dolphins players were tagged. For the first time, Plaintiffs demonstrated the tracking of game objects, such as down markers and the first down chains by adding tags to those objects.

157. Zebra employees Belinda Turner and Bill Bulzoni attended the December 23, 2012, NFL game between the Buffalo Bills and the Miami Dolphins.

158. Cynthia Traeger, a Zebra consultant and close business associate of Ms. Stelfox, also attended the December 23, 2012, Bills versus Dolphins game for Zebra.

159. Ms. Turner, Mr. Bulzoni and Ms. Traeger sat with Ed Evansen, Noah Fischbach and Vishal Shah in the control room to monitor the IsoLynx System.

160. The testing of the IsoLynx System at the December 23, 2012, Bills versus Dolphins game was highly successful.

161. Ms. Turner was very impressed with the IsoLynx System at the December 23, 2013, Bills versus Dolphins game.

162. No Zebra employee or consultant contributed to or participated in any of the work done to set up or to conduct testing of the IsoLynx System at the December 23, 2012, Bills versus Dolphins game, or any prior NFL game.

163. On December 28, 2012, Plaintiffs removed the IsoLynx System from Sun Trust Stadium.

164. Based on its assessment of the IsoLynx System under the Lynx-NFL Enterprises NDA, including the operation and performance of the IsoLynx System during the 2012 NFL season, NFL Enterprises determined that it wanted to deploy the IsoLynx System for NFL games.

165. On December 31, 2012, Mr. Fischbach requested a meeting between NFL Enterprises, Plaintiffs and Zebra to discuss the details and logistics of deploying Plaintiffs' IsoLynx System during the next NFL season.

166. At the request of Plaintiffs, Sportvision was later invited to the meeting that was requested by Mr. Fischbach.

167. The meeting requested by Mr. Fischbach on December 31, 2012, took place on January 11, 2013.

168. Prior to the January 11, 2013, meeting, at the request of Zebra and under the Lynx-ZES Mutual Confidentiality Agreement, Plaintiffs confidentially sent Zebra additional

trade secrets and other proprietary and confidential information and know-how about the IsoLynx System, including modified tags from the December 23, 2012, game between the Dolphins and the Bills and data and specifications for RJ45 relay banks for use in implementing redundancy in the IsoLynx System.

169. On January 10, 2013, Zebra provided to Plaintiffs a "Lynx/Zebra Engineering Review" that reported on the performance of the modified tags from the December 23, 2012 game between the Dolphins and the Bills, which had been re-engineered by Plaintiffs with Zebra's knowledge, consent and encouragement.

170. The "Lynx/Zebra Engineering Review" was provided under the Lynx-ZES Mutual Confidentiality Agreement.

171. On January 11, 2013, a meeting was held between Plaintiffs, Zebra, NFL Enterprises and Sportvision. Ed Evansen and Doug DeAngelis attended for Plaintiffs. Jill Stelfox, Ed Richley, Belinda Turner, Cynthia Traeger and one additional person attended for Zebra. Noah Fischbach, Vishal Shah, Josh Helmrich, Matt Swensson and David Healy attended for NFL Enterprises. Jeff Jonas, Mike Jakob and Hank Adams attended for Sportvision.

172. The January 11, 2013, meeting was subject to Plaintiffs' existing agreements with Zebra, NFL Enterprises and Sportvision, specifically the provisions in those agreements that addressed the handling and disclosure of confidential or proprietary information.

173. Zebra, through Ms. Stelfox and other Zebra employees and officers, repeatedly and, as it turned out, falsely represented to Plaintiffs that Zebra was acting in good faith and fairly in its dealings with Plaintiffs, that Zebra had no intention to injure or cause other harm to Plaintiffs and that Zebra intended to honor and fulfill its contractual and fiduciary obligations to Plaintiffs.

174. For example, on January 29, 2013, Ms. Stelfox represented to Messrs. Evansen and DeAngelis via telephone that Zebra would not provide a real time player tracking system to the NFL without Plaintiffs.

175. Plaintiffs relied on Ms. Stelfox's representation made on January 29, 2013.

176. On February 5, 2013, Ms. Stelfox represented to Mr. Evansen via telephone that cutting out Plaintiffs "would be the wrong thing to do" and it would "make no business sense to derail a train which is in full motion."

177. Again, Plaintiffs relied on Ms. Stelfox's representation made on February 5, 2013.

178. In proceeding with their discussions and dealings with Zebra in the following months, Plaintiffs relied upon the overall and individual representations made by Ms. Stelfox, including those made on January 29, 2013, February 5, 2013 and March 29, 2013.

179. At the time Ms. Stelfox made the statements identified in paragraphs 173, 174 and 176, and contrary to her representations to Plaintiffs, Zebra was engaged in secret discussions with NFL Enterprises for Zebra to provide, without Plaintiffs' participation, a real time player tracking system that used Plaintiffs' trade secrets and other proprietary and confidential information and know-how.

180. At or around the time that Ms. Stelfox made the statements identified in paragraphs 173, 174 and 176, contrary to her representations to Plaintiffs, Zebra was secretly engaged in its preparation to cut out Plaintiffs from providing a real time player tracking system to the NFL that was based on Plaintiffs' innovations and technologies and to claim as Defendants' own intellectual property Plaintiffs' trade secrets and other proprietary and confidential information disclosed to Zebra confidentially, including seeking to file patent applications on such trade secrets and proprietary and confidential information and know-how.

181. As the Vice President and General Manager of Zebra's RTLS division, and because of her involvement in the discussions and dealings between Plaintiffs and Zebra with respect to Plaintiffs' trade secrets and other proprietary and confidential information and know-how, Ms. Stelfox knew that, contrary to her representations and assurances, Zebra was engaged in discussions with NFL Enterprises for Zebra to provide, without Plaintiffs' participation, a real time player tracking system that used Plaintiffs' trade secrets and other proprietary and confidential information and know-how.

**Zebra's Attempt to Acquire IsoLynx**

182. On February 11, 2013, Ms. Stelfox telephoned Mr. Evansen and told him that she had spoken with Zebra's board of directors about the IsoLynx System and the business opportunity with NFL Enterprises and that Zebra wanted to acquire IsoLynx, including the IsoLynx System, including Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how used in the system.

183. When Mr. Evansen mentioned IsoLynx's obligations under the IsoLynx-Sportvision Collaboration Agreement during the February 11, 2013, telephone call, Ms. Stelfox responded that the agreement could be circumvented through an asset-only purchase or, alternatively, Zebra would abide by the agreement.

184. On February 12, 2013, Ms. Stelfox telephoned Mr. Evansen and told him that Zebra wanted to provide terms for an acquisition of IsoLynx.

185. On February 14, 2013, Ms. Stelfox told Mr. Evansen that although Zebra was prepared to provide terms for an acquisition of IsoLynx, Zebra first needed to see a copy of the IsoLynx-Sportvision Collaboration Agreement.

186. Mr. Evansen responded that he would need to investigate whether he was authorized to provide a copy of the IsoLynx-Sportvision Collaboration Agreement to Zebra.

187. On February 15, 2013, Mr. Evansen told Ms. Stelfox that, under a separate non-disclosure agreement that would govern discussions regarding Zebra's potential acquisition of IsoLynx, Plaintiffs would provide Zebra with a copy of the IsoLynx-Sportvision Collaboration Agreement with the financial information redacted.

188. Ms. Stelfox agreed to Mr. Evansen's proposal with respect to the provision of the redacted IsoLynx-Sportvision Collaboration Agreement under a non-disclosure agreement.

189. Mr. Evansen sent Ms. Stelfox a Mutual Non-Disclosure Agreement between ZTC and IsoLynx (the "IsoLynx-ZTC NDA") for the purpose of disclosing information for the contemplated acquisition of IsoLynx by Zebra.

190. Ms. Stelfox executed the IsoLynx-ZTC NDA on behalf of ZTC. Mr. Evansen executed the IsoLynx-ZTC NDA on behalf of IsoLynx.

191. The IsoLynx-ZTC NDA states that

> [w]ithout the prior written consent of Disclosing Party and except as otherwise required by applicable law, Receiving Party shall keep, and shall cause its Representatives to keep, all Proprietary Information of Disclosing Party confidential …. Receiving Party shall not, and shall cause its Representatives to not, use any Proprietary Information of Disclosing Party for the benefit of itself or any other third party or for any purpose other than to evaluate the Proposed Transaction or in connection with the consummation of the Proposed Transaction.

192. The IsoLynx-ZTC NDA defines "Proprietary Information" to mean

> any and all confidential information and material disclosed by one party to the other party in connection with the Proposed Transaction or in the course of either party's evaluation of the Proposed Transaction…includ[ing] the fact that discussions or negotiations are taking place concerning the Proposed Transaction or the fact of the Proposed Transaction or that any Proprietary Information has been shared between the parties and their respective Representatives in connection therewith, and …the proposed terms and conditions of the Proposed Transaction (including any financial terms and conditions) and the status thereof.

193. The IsoLynx-ZTC NDA states that "[a]s between Disclosing Party and Receiving Party, all Proprietary Information (including, without limitation, all copies, extracts and portions

thereof) is and shall remain the sole property of Disclosing Party. Receiving Party does not acquire (by license or otherwise, whether express or implied) any intellectual property rights or other rights under this Agreement or any disclosure hereunder, except the limited right to use such Proprietary Information of Disclosing Party in accordance with the express provisions of this Agreement."

194. The IsoLynx-ZTC NDA states that "Receiving Party agrees that, due to the unique nature of the Proprietary Information, the unauthorized disclosure or use of the Proprietary Information may cause irreparable harm and significant injury to Disclosing Party, the extent of which will be difficult to ascertain and for which there may be no adequate remedy at law. Accordingly, Receiving Party agrees that Disclosing Party, in addition to any other available remedies, shall have the right to an immediate injunction and other equitable relief enjoining any breach or threatened breach of this Agreement, without the necessity of posting any bond or other security."

195. On February 18, 2013, and under the IsoLynx-ZTC NDA, Mr. Evansen sent Ms. Stelfox a copy of the IsoLynx-Sportvision Collaboration Agreement with the financial information redacted.

196. On February 21, 2013, Ms. Stelfox made a verbal offer to Mr. Evansen for Zebra to acquire IsoLynx.

197. Ms. Stelfox's offer was far under the value of IsoLynx and, thus, it was rejected.

198. In response to Mr. Evansen's rejection of Ms. Stelfox's February 21, 2013 verbal offer, Ms. Stelfox agreed to provide a revised offer.

199. On February 28, 2013, Ms. Stelfox telephoned Mr. Evansen and told him that although she did not have a revised offer for Zebra to acquire IsoLynx, Mr. Evansen should provide a proposal on behalf of IsoLynx for its acquisition.

200. On March 5, 2013, Mr. Evansen provided a verbal proposal to Ms. Stelfox for Zebra to acquire IsoLynx.

201. Ms. Stelfox told Mr. Evansen that she would need to submit his March 5, 2013, verbal proposal to Zebra's board of directors for approval. Neither Ms. Stelfox nor any other Zebra executive ever provided a counter-offer or any other type of response. Instead, Defendants decided to take from Plaintiffs without any compensation, rather than acting in good faith and paying for Plaintiffs' inventions and technologies and the business opportunities created by Plaintiffs, and embarked on a plan to cut out Plaintiffs through subterfuge and fraudulent representations and misrepresentations.

202. On March 7, 2013, Sportvision proposed a meeting between Sportvision, Zebra and Plaintiffs to discuss a collaborative approach to working with NFL Enterprises. The meeting was scheduled for March 15, 2013.

**Zebra's Scheme to Take the IsoLynx System and Cut Out Plaintiffs**

203. Rather than working with Plaintiffs in good-faith and fulfilling its fiduciary and contractual obligations owed to Plaintiffs or acquiring the IsoLynx System and the associated inventions and technologies created and developed by IsoLynx through legitimate means, Zebra schemed to take the IsoLynx System and the associated inventions and technologies for itself (without the need to pay Plaintiffs for them) and cut out Plaintiffs from the business opportunity with the NFL and reaping any direct or indirect benefits from associating with the NFL and other prospective business partners or customers as Plaintiffs contemplated.

204. Zebra's scheme, unbeknownst to Plaintiffs at the time Zebra was planning and executing the scheme, included admittedly fabricating allegations that Lynx breached the ZES-Lynx Solutions Agreement and the ZES-Lynx OEM Agreement such that Plaintiffs could not acquire and use Dart components for the IsoLynx System as contemplated in those agreements.

Zebra also schemed to poison and irreparably harm Plaintiffs' relationship with Sportvision, such that Plaintiffs and Sportvision could not provide an integrated real-time player tracking system as planned.

205. In a March 8, 2013, letter to Mr. Evansen, Ms. Stelfox falsely asserted that the IsoLynx-Sportvision Collaboration Agreement "can be read to evidence the direct disclosure to Sportvision of sensitive Zebra confidential information and confidential technology[,]" which purportedly constituted a breach of the ZES-Lynx Solutions Agreement.

206. In her March 8, 2013, letter, Ms. Stelfox also asserted that Zebra was entitled to terminate the ZES-Lynx Solutions Agreement, but "[g]iven what to date we understood was a strong relationship, we will refrain from immediate termination, to give [Lynx] an opportunity to address and remove [Zebra's] concerns."

207. In her March 8, 2013, letter, Ms. Stelfox failed to identify what specific "sensitive Zebra confidential information" was allegedly disclosed in the IsoLynx-SportVision Collaboration Agreement.

208. After sending her March 8, 2013, letter, Mr. Stelfox conveyed to Plaintiffs that she had an ulterior motive in sending the letter to Plaintiffs, that her letter alleging breach by Lynx should not be taken at its face value by Plaintiffs and that her letter was sent to achieve other business objectives of Zebra.

209. On March 11, 2013, during a telephone conversation with Mr. Evansen, Ms. Stelfox told Mr. Evansen that her March 8, 2013 letter was part of a plan to artificially force a termination of the IsoLynx-Sportvision Collaboration Agreement, which Ms. Stelfox and Zebra believed would then clear the way for Zebra and Plaintiffs to work directly with NFL Enterprises without Sportvision's participation.

210. During the March 11, 2013, telephone conversation, Mr. Evansen told Ms. Stelfox that Plaintiffs would not participate in Zebra's proposed subterfuge and he ended the telephone call.

211. On March 11, 2013, Mr. Evansen sent Ms. Stelfox a letter stating that, contrary to Ms. Stelfox's assertions in her admitted subterfuge March 8, 2013, letter, Lynx had not disclosed "sensitive Zebra confidential information and confidential technology" to Sportvision and providing confirmation that Lynx had complied with the confidentiality provisions in the ZES-Lynx Solutions Agreement.

212. On March 13, 2013, Ms. Stelfox provided Mike Jakob at Sportvision a diagram that falsely suggested that Zebra, and not Plaintiffs, would provide Plaintiffs' proprietary and confidential tag modifications and hardware band pass filter technology.

213. Through false and misleading representations made separately to Plaintiffs and Sportvision, Defendants and Ms. Stelfox tried to enlist Plaintiffs on Zebra's scheme to cut out Sporvision and, at the same time, tried to enlist Sportvision on Zebra's scheme to cut out Plaintiffs in the business opportunity of providing a real time player tracking system to the NFL.

214. Zebra attempted to cut out both Plaintiffs and Sportvision so that it can reap all of the benefits of the business opportunity of providing a real time player tracking system to the NFL that was made possible by Plaintiffs' inventions, technologies and efforts.

215. On March 19, 2013, Noah Fischbach of NFL Enterprises reassured Mr. Evansen that the NFL would not proceed with the real time player tracking system without Plaintiffs and the IsoLynx technology.

216. On March 22, 2013, Mr. Evansen called Ms. Stelfox to schedule a meeting between Plaintiffs and Zebra. The meeting was scheduled for, and took place on, March 27, 2013, in New York.

217. At the March 27, 2013, meeting between Plaintiffs and Zebra, Cynthia Traeger on behalf of Zebra, asserted for the first time that the IsoLynx System was no different from previous technology developed by Zebra, contradicting prior statements made by Zebra.

218. At no time before the March 27, 2013, meeting had anyone associated with Zebra made an assertion such as Ms. Traeger's assertion. Contrary to Ms. Traeger's assertion, Zebra, up to that point, had repeatedly stated that the IsoLynx System and the inventions that Plaintiffs had created, developed and implemented for the NFL real-time athlete tracking and game analysis system were new, valuable and innovative.

219. On March 29, 2013, Ms. Stelfox sent an email to Mr. Evansen assuring Plaintiffs "I still very much want to figure out a way to work together" and referred to "the conversation you and I had about the pieces IsoLynx wants to perform for the NFL" including Plaintiffs "helping support stadium prep, the black box, tagging the players and the camera application."

220. Ms. Stelfox's representation made on March 29, 2013, was false because Defendants and their officers and employees, including Ms. Stelfox, had already begun implementing steps to cut out Plaintiffs from the NFL business opportunity.

221. On April 18, 2013, contrary to her prior representations and statements, Ms. Stelfox sent a letter to Mr. Evansen purporting to provide "formal notice of immediate termination of the Zebra-Lynx relationship" and, specifically, termination of the ZES-Lynx Solutions Agreement and the ZES-Lynx OEM Agreement.

222. In her April 18, 2013, letter to Mr. Evansen, Ms. Stelfox erroneously asserted that "Sportvision just disclosed Zebra's confidential discounted pricing to the NFL. Sportvision obtained this information from Lynx[.]" In addition, Ms. Stelfox also erroneously asserted that Lynx had breached the ZES-Lynx Solutions Agreement and the ZES-Lynx OEM Agreement by "modif[ying] Zebra systems and technology."

223. Ms. Stelfox's April 18, 2013, letter was a subterfuge to cut Plaintiffs out of the business opportunity with the NFL and then use Plaintiffs' trade secrets and other proprietary and confidential information and know-how in and related to the IsoLynx System.

224. Neither Lynx nor IsoLynx modified any Zebra "firmware" or "Firmware," as those terms are defined in the ZES-Lynx Solutions Agreement and the ZES-Lynx OEM Agreement.

225. To the extent Lynx or IsoLynx modified Zebra "Hardware," as that term is defined in the ZES-Lynx Solutions Agreement and the ZES-Lynx OEM Agreement, such modifications were made with Zebra's knowledge, consent and encouragement in connection with the Lynx-ZES Mutual Confidentiality Agreement.

226. Before Ms. Stelfox sent her April 18, 2013, letter to Mr. Evansen, Sportvision informed Ms. Stelfox that it did not obtain any Zebra pricing information from Plaintiffs or elsewhere, thus, refuting the subsequent assertion made by Ms. Stelfox.

227. On April 24, 2013, Mr. DeAngelis wrote to ZTC's CEO, Anders Gustafsson, regarding the assertions in Ms. Stelfox's April 18, 2013 letter and to propose a discussion about repairing the relationship between Plaintiffs and Zebra.

228. On April 25, 2013, Plaintiffs' counsel responded to Ms. Stelfox's April 18, 2013, letter, denying any wrongdoing and asking Zebra to provide evidence in support of Ms. Stelfox's assertions.

229. Zebra has failed to produce any evidence that supported the assertions found in Ms. Stelfox's April 18, 2013, letter.

230. On May 3, 2013, during a phone conversation with Mr. DeAngelis, Mr. Gustafsson denied that Zebra was excluding Plaintiffs from the business opportunity with NFL

Enterprises and made an affirmative representation to Plaintiffs that Zebra was trying to give the NFL a solution that included IsoLynx.

231. In proceeding with their discussions and dealings with Zebra in the following months, Plaintiffs relied upon the statement made by Mr. Gustafsson on May 3, 2013.

232. At the time of, and contrary to, Mr. Gustafsson's May 3, 2013, statement to Plaintiffs, Zebra was engaged in secret discussions with NFL Enterprises for Zebra to provide, without Plaintiffs' participation, a real time player tracking system that used Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how. At or around the time of Mr. Gustafsson's May 3, 2013, statement, and contrary to his representation to Plaintiffs, Zebra was secretly engaged in the preparation to cut out Plaintiffs from providing a real time player tracking system to the NFL that was based on Plaintiffs' inventions and technologies and to claim as Defendants' own intellectual property Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how disclosed to Zebra confidentially, including seeking to file patent applications on such inventions, trade secrets and other proprietary and confidential information and know-how.

233. As the CEO of ZTC, Mr. Gustafsson knew that Zebra was engaged in discussions with NFL Enterprises for Zebra to provide, without Plaintiffs' participation, a real-time player tracking system that used Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how.

234. During his May 3, 2013, telephone conversation with Mr. DeAngelis, Mr. Gustafsson also told Mr. DeAngelis that his understanding as the CEO of ZTC was that Plaintiffs could include Zebra's components in the IsoLynx System for other customers.

235. Contrary to Mr. Gustafsson's representation, Zebra refused to supply Dart components used in the IsoLynx System.

236. On June 4, 2013, IsoLynx's patent counsel wrote to Zebra's Vice President and General Counsel, Jim Kaput, regarding Defendants' obligations not to use or exploit Plaintiffs' inventions, trade secrets and other confidential information and intellectual property and know-how that had been disclosed under the Lynx-ZES Mutual Confidentiality Agreement, including, without limitations, information pertaining to:

> Modified UWB Real Time Location System Sensor incorporating band-pass filtering for immunizing against interferers
>
> Modified UWB Real Time Location System Tag to achieve a sufficiently low profile for mounting in sports equipment
>
> Methods for mounting UWB Real Time Location System Tags in shoulder pads
>
> Software tools for installing diagnosing and optimizing UWB Real Time Location System in sporting venues
>
> Software tools for managing the team/player/tag/settings relationships in a sporting application
>
> Methods for real time monitoring of UWB Real Time Location System level accuracy to insure data integrity

237. On June 30, 2013, Belinda Turner, Zebra's Director, RFID Engineering – RTLS, called Ed Evansen to inquire whether Plaintiffs had had any recent discussions with NFL Enterprises about the IsoLynx System. Mr. Evansen responded that there had been no such discussions. Ms. Turner indicated that Zebra was unable to achieve results that were accurate, in real time and responsive without Plaintiffs' IsoLynx technology.

**Termination of Plaintiffs' Business Relationships with the NFL and Sportvision as a Result of Zebra's Actions**

238. As a result of Ms. Stelfox's April 18, 2013, letter purportedly terminating the ZES-Lynx Solutions Agreement and the ZES-Lynx OEM Agreement, Zebra unilaterally stopped supplying components that it had been supplying for use in the IsoLynx System, specifically

Dart components, pursuant to the ZES-Lynx Solutions Agreement and the ZES-Lynx OEM Agreement.

239. Because of Zebra's refusal to supply Dart components under the ZES-Lynx Solutions Agreement and the ZES-Lynx OEM Agreement, until Plaintiffs were able to evaluate, test, customize and implement other off-the-shelf components from other RFID equipment suppliers into the IsoLynx System, which is a time-consuming process, Plaintiffs were not able to provide a fully operational IsoLynx System for customers and potential customers, including NFL Enterprises and Sportvision.

240. Specifically, because of Zebra's refusal to supply Dart components under the ZES-Lynx Solutions Agreement and the ZES-Lynx OEM Agreement, again, until Plaintiffs were able to evaluate, test, customize and implement other off-the-shelf components from other RFID equipment suppliers into the IsoLynx System, which is a time-consuming process, Plaintiffs were not able to provide the necessary components for the integrated IsoLynx/Sportvision end-to-end tracking and data generation system contemplated by the IsoLynx-Sportvision Collaboration Agreement.

241. As a result of Zebra's wrongful termination of the ZES-Lynx Solutions Agreement and the ZES-Lynx OEM Agreement based on unsupported and false assertions and as part of Zebra's admitted subterfuge to artificially force a termination of IsoLynx and Sportvision's relationship and agreement, the IsoLynx-Sportvision Collaboration Agreement was terminated in October 2013.

242. Because of Zebra's refusal to supply Dart components under the ZES-Lynx Solutions Agreement and the ZES-Lynx OEM Agreement, Plaintiffs became unable to provide a fully operational IsoLynx System to NFL Enterprises for installation and use during NFL preseason and regular games.

243. Zebra, without Plaintiffs' participation and prior knowledge, installed real-time player tracking systems in two NFL stadiums for use during the NFL's 2013 preseason games using Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how, usurping Plaintiffs' business opportunities and eliminating any meaningful possibility for Plaintiffs to become the provider of such a system to the NFL.

244. IsoLynx has sought patent protection for its inventions related to the IsoLynx System, and these inventions have been described and claimed in patent applications that published and issued well after Zebra's misappropriation and breaches of the Lynx-ZES Mutual Confidentiality Agreement, which have been assigned to IsoLynx by the developers and/or inventors of the inventions, trade secrets and other proprietary and confidential information and know-how. The inventions, trade secrets and other proprietary and confidential information and know-how related to the IsoLynx System contained in IsoLynx's published patent applications and issued patents were kept confidential and from public knowledge prior to the publication of IsoLynx's patent applications by the U.S. Patent and Trademark Office.

**Zebra's Unlawful Uses of and Benefits From Plaintiffs' Inventions, Trade Secrets and Other Proprietary and Confidential Information and Know-How**

245. Zebra used Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how disclosed to Zebra in confidence by Plaintiffs to design, develop, commercialize and use the Zebra MotionWorks™ real-time player tracking system.

246. Plaintiffs did not authorize Zebra to use Plaintiffs' inventionsk, trade secrets and other proprietary and confidential information and know-how to design, develop, commercialize or use the Zebra MotionWorks™ real-time player tracking system.

247. The Zebra MotionWorks™ system incorporates and uses Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how.

248. Plaintiffs did not authorize Zebra to incorporate or use Plaintiffs' inventions, trade secrets or other proprietary and confidential information and know-how in or in connection with the Zebra MotionWorks™ system.

249. Without authorization from Plaintiffs, Zebra has used photographs and descriptions of Plaintiffs' profile modified tags attached to shoulder pads owned by Plaintiffs to promote the Zebra MotionWorks™ system.

250. At least some of the same Zebra personnel who obtained and had access to Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how under the Lynx-ZES Mutual Confidentiality Agreement were and/or are responsible for and/or involved in the design, development, implementation and use of the Zebra MotionWorks™ system.

251. Zebra could not have developed a commercially viable real-time player tracking system without the use and incorporation of Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how.

252. Zebra has reaped, continues to reap, and will reap in the future, substantial benefits from the use and incorporation of Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how in and in connection with the Zebra MotionWorks™ system.

253. During the 2013 NFL preseason and regular seasons, Zebra MotionWorks™ was installed and used for NFL games in Detroit and San Francisco.

254. In July 2014, Zebra entered into a five-year partnership agreement with the NFL under which Zebra became "The Official On-Field Player-Tracking Provider of the NFL." Under that agreement, the MotionWorks™ system will be used in all 31 NFL stadiums, and Wembley Stadium in London, in the 2015 NFL regular season.

255. During the 2014 NFL regular season, the Zebra MotionWorks™ system was installed and used in the 15 stadiums that hosted Thursday Night Football games (the NFL stadiums located in Atlanta, Baltimore, Carolina (Charlotte), Chicago, Cincinnati, Denver, Green Bay, Houston, Jacksonville, Miami, New England (Foxborough), Oakland, San Francisco, St. Louis, and Washington, D.C., as well as in Detroit and New Orleans, and was used to capture information from all 32 NFL teams.

256. The Zebra MotionWorks™ was installed and used in the NFL's Pro Bowl Game, held on January 25, 2015, and Super Bowl XLIX, held on February 1, 2015.

257. Zebra has entered into agreements with multiple NFL teams for use of the Zebra MotionWorks™ system during their practices.

258. Zebra has reaped substantial monetary, marketing and public relations benefits from its relationship with the NFL based on the Zebra MotionWorks™ system.

259. For example, Zebra's deal with the NFL for the installation and operation of the Zebra MotionWorks™ system is worth at least $50 million.

260. Based on the Zebra MotionWorks™ system, Zebra has publicly touted itself, with the NFL, as "Partners in Innovation."

261. Zebra's relationship with the NFL has resulted in additional business and business opportunities for Zebra, both within and outside sports markets.

262. Sports leagues other than the NFL have approached Zebra about integrating the hardware found in the Zebra MotionWorks™ into their own games.

263. Zebra has provided the Zebra MotionWorks™ system to at least one NCAA football team and at least one hockey team.

264. The Zebra MotionWorks™ system has produced growth in Zebra's overall RFID business.

265. Zebra has received industry awards for the Zebra MotionWorks™ system. For example, the Zebra MotionWorks™ system was a People's Choice Winner of the 2014 Internet of Things Awards by Postscapes, and the Zebra MotionWorks™ system won a 2015 Sports Business Award in the category of Best in Sports Technology.

266. Zebra has touted the very features made possible by Plaintiffs' intellectual property, claiming that the "real-time, next generation sports statistics, event and visualization platform leverages Zebra's predictive analytics technology," which Defendants misappropriated from Plaintiffs.

267. Defendants have stated that they intend to leverage its business relationship with the NFL to expand their business in the real-time athlete tracking and game analysis market to "the entire sports world" and "every sport."

268. Defendants have benefitted in numerous other ways. One such benefit is the substantial increase in the valuation of the Zebra stock, which increased from $80.07 per share at the time of the official announcement of the NFL/Zebra partnership (July 31, 2014) to $109.64 per share on May 29, 2015. The appreciation in the Zebra stock price during that period (approximately 37%) outperformed the NASDAQ Composite Index (which increased by 16%) by more than 200% and the S&P 500 Index (which increased by approximately 9.2%) by more than 400%.

269. Defendants would not have obtained the above benefits without their unlawful use and incorporation of Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how in and in connection with the MotionWorks™ system.

**Defendants' Unlawful Patent Filings**

270. In addition to the unlawful use of Plaintiffs' trade secrets and other proprietary and confidential information in the Zebra MotionWorks™ system, Defendants have unlawfully

misappropriated, used and disclosed Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how by incorporating them into filings submitted to the USPTO.

271. On June 6, 2013, ZIH filed U.S. Provisional Application No. 61/831,990, titled "Performance Analytics Based on Real-Time Data for Proximity and Movement of Objects," including Exhibits A-F ("the Zebra Provisional Application") with the USPTO. This was only one day after the delivery of Plaintiffs' June 4, 2013, letter to Zebra's Vice President and General Counsel referred to in paragraph 236 above in which Plaintiffs reminded Defendants of Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how disclosed in confidence under the Lynx-ZES Mutual Confidentiality Agreement and Defendants' obligation not to use or exploit those inventions, trade secrets and other proprietary and confidential information and know-how. Nevertheless, the Zebra Provisional Application incorporates inventions, trade secrets and other proprietary and confidential information and know-how related to the IsoLynx System that Plaintiffs disclosed to Zebra under the Lynx-ZES Mutual Confidentiality Agreement.

272. The Zebra Provisional Application identifies, as inventors, Zebra personnel who had direct access to Plaintiffs' trade secrets and other proprietary and confidential information, including Jill Stelfox, Cynthia Traeger, Ed Richley and Belinda Turner.

273. Since that time, ZIH has filed numerous patent applications that claim priority based on the Zebra Provisional Application and that identify as inventors Zebra personnel who had direct access to Plaintiffs' trade secrets and other proprietary and confidential information.

274. By filing patent applications that contain Plaintiffs' trade secrets and other proprietary and confidential information related to the innovation and technologies used in the IsoLynx System without identifying Plaintiffs' employees as inventors, Defendants and their

employees have attempted to claim as their own intellectual property and falsely represented to the United States Patent and Trademark Office that they had created, developed and own Plaintiffs' trade secrets and other proprietary and confidential information and know how, with the full knowledge that it was Plaintiffs and their scientists and engineers who were the true inventors of these innovations and technologies.

**COUNT I**

**TRADE SECRET MISAPPROPRIATION**

**(On behalf of Plaintiffs against all Defendants)**

275. Plaintiffs reallege and incorporate by reference paragraphs 1-274 as if fully set forth herein.

276. Plaintiffs' Protected Information includes protectable trade secrets owned by them.

277. Plaintiffs used their protectable trade secrets in connection with their business.

278. Plaintiffs' protectable trade secrets gave Plaintiffs opportunities to obtain advantages over competitors who did not know or use the protectable trade secrets.

279. Plaintiffs undertook reasonable steps to secure and maintain the confidentiality and secrecy of the protectable trade secrets contained in the Protected Information.

280. After Plaintiffs confidentially disclosed the Protected Information, including the protectable trade secrets embodied therein, to Zebra, Zebra improperly used, improperly disclosed, and otherwise misappropriated these trade secrets.

281. The information Zebra improperly used, improperly disclosed, and otherwise misappropriated includes Plaintiffs' trade secrets at the time of Zebra's misappropriation.

282. Zebra improperly used the protectable trade secrets by using them in a manner not authorized by the Lynx-ZES Mutual Confidentiality Agreement and in a manner not authorized by law.

283. Zebra improperly disclosed the protectable trade secrets by disclosing them to individuals who are not authorized to view the protectable trade secrets under the Lynx-ZES Mutual Confidentiality Agreement and by law.

284. ZIH has improperly used and disclosed the protectable trade secrets by filing the Zebra Provisional Application and patent applications claiming priority based on the Zebra Provisional Application, which incorporate trade secrets and other proprietary and confidential information related to the IsoLynx System without authorization and falsely asserting that employees of Zebra created, developed and own Plaintiffs' trade secrets and other proprietary and confidential information and know how.

285. IsoLynx has been harmed and continues to be harmed, and Defendants have been unjustly enriched, by Defendants' improper use, improper disclosure, and misappropriation of Plaintiffs' protectable trade secrets, and Defendants' use, disclosure and misappropriation was a substantial factor in causing Plaintiffs' harm and Defendants' unjust enrichment.

## COUNT II

## BREACH OF CONTRACT

## (On behalf of Lynx against ZES)

286. Plaintiffs reallege and incorporate by reference paragraphs 1-285 as if fully set forth herein.

287. The Lynx-ZES Mutual Confidentiality Agreement is a valid and enforceable contract entered into between Lynx and ZES.

288. Plaintiffs' Protected Information is "Confidential Information" as defined in the Lynx-ZES Mutual Confidentiality Agreement.

289. Lynx fulfilled all of its obligations pursuant to the Lynx-ZES Mutual Confidentiality Agreement.

290. Pursuant to the Lynx-ZES Mutual Confidentiality Agreement, ZES agreed to "maintain and preserve the confidentiality of [Lynx's] Confidential Information"; to "disclose [Lynx's] Confidential Information to only those of its employees, independent contractors and/or advisors who are bound by written agreement or professional obligation to preserve the confidentiality of such Confidential Information upon terms substantially in conformance with the terms of [the Lynx-ZES Mutual Confidentiality Agreement]"; and to "use [Lynx's] Confidential Information solely in connection with evaluating whether to engage in a collaborative business relationship with [Lynx] and in pursuit of the purposes of such relationship."

291. ZES did not "maintain and preserve the confidentiality of [Lynx's] Confidential Information," failed to comply with its obligations to "disclose [Lynx's] Confidential Information to only those of its employees, independent contractors and/or advisors who are bound by written agreement or professional obligation to preserve the confidentiality of such Confidential Information upon terms substantially in conformance with the terms of [the Lynx-ZES Mutual Confidentiality Agreement]"; and failed to comply with its obligations to "use [Lynx's] Confidential Information solely in connection with evaluating whether to engage in a collaborative business relationship with [Lynx] and in pursuit of the purposes of such relationship."

292. Pursuant to the Lynx-ZES Mutual Confidentiality Agreement, ZES agreed that it "shall not otherwise use or exploit [Lynx's] Confidential Information for its own benefit or purposes, or for the benefit or purposes of any third party."

293. ZES used and exploited Lynx's Confidential Information for its own benefit or purposes, or for the benefit or purposes of one or more of third parties in furtherance of Defendants' unauthorized and wrongful actions complained of herein.

294. Pursuant to the Lynx-ZES Mutual Confidentiality Agreement, ZES agreed that it "shall notify [Lynx] immediately upon discovery of any unauthorized use or disclosure of [Lynx's] Confidential Information or any other breach of this paragraph 3 [of the Lynx-ZES Mutual Confidentiality Agreement], and shall reasonably assist [Lynx] to regain possession of its Confidential Information and prevent any further unauthorized use."

295. ZES did not notify Lynx immediately upon discovery of any unauthorized use or disclosure of Lynx's Confidential Information or any other breach of paragraph 3 of the Lynx-ZES Mutual Confidentiality Agreement. Instead, ZES and other Defendants attempted to conceal their wrongful and deceitful actions from Plaintiffs, made fraudulent representations to Plaintiffs to further Defendants' wrongful business objectives and concealment of their actions and filed patent applications on the Confidential Information provided to ZES by Plaintiffs under the Lynx-ZEUS Mutual Confidentiality Agreement.

296. Pursuant to the Lynx-ZES Mutual Confidentiality Agreement, ZES agreed that "[e]ach party shall retain ownership of all right, title and interest in and to its Confidential Information, and nothing in this Agreement shall be construed to convey to the Receiving Party any right, title, license or interest in any Confidential Information provided by the Disclosing Party."

297. ZES and other Defendants have unlawfully misappropriated, used and disclosed Plaintiffs' trade secrets and other proprietary and confidential information by incorporating them into filings submitted by ZIH to the United States Patent and Trademark Office ("USPTO"), including U.S. Provisional Application No. 61/831,990, titled "Performance Analytics Based on Real-Time Data for Proximity and Movement of Objects," including Exhibits A-F ("the Zebra Provisional Application"), which was filed by ZIH on June 6, 2013, which incorporates trade secrets and other proprietary and confidential information that Plaintiffs confidentially disclosed to Zebra's personnel such as Jill Stelfox, Cynthia Traeger, Ed Richley and Belinda Turner and which name these Zebra personnel as "inventors" of these innovations and technologies claimed and described in the patent applications.

298. Notwithstanding the obligations and prohibitions set forth in the Lynx-ZES Mutual Confidentiality Agreement, ZES and other Defendants have caused ZIH to file numerous patent applications that claim priority based on the Zebra Provisional Application.

299. ZES breached the Lynx-ZES Mutual Confidentiality Agreement by disclosing Plaintiffs' Protected Information for purposes expressly prohibited by the Lynx-ZES Mutual Confidentiality Agreement, including using Plaintiffs' Protected Information for its own benefit and for the benefit of third parties, including ZTC, ZIH, and the NFL and by using Plaintiffs' Protected Information in a manner not authorized by the Lynx-ZES Mutual Confidentiality Agreement.

300. Lynx has been damaged, and ZES has been unjustly enriched, by ZES's breach of the Lynx-ZES Mutual Confidentiality Agreement in an amount to be determined at trial.

**COUNT III**

**INTENTIONAL INTERFERENCE WITH EXISTING CONTRACTUAL AND ADVANTAGEOUS BUSINESS RELATIONSHIPS**

**(On behalf of Plaintiffs against ZES and ZTC)**

301. Plaintiffs reallege and incorporate by reference paragraphs 1-300 as if fully set forth herein.

302. From March 2012 to October 2013, Plaintiffs had an advantageous business relationship with Sportvision. Moreover, from December 2012 to October 2013, IsoLynx had an expressly contractual relationship with Sportvision that was embodied in the IsoLynx-Sportvision Collaboration Agreement.

303. Zebra knew of Plaintiffs' advantageous business relationship and contractual relationship with Sportvision.

304. In 2013, Zebra intentionally and improperly interfered with Plaintiffs' advantageous business and contractual relationships with Sportvision.

305. Zebra's Vice President and General Manager – RTLS, Jill Stelfox, sent Plaintiffs a letter containing unsupported assertions of wrongdoing by Plaintiffs in an attempt to force Plaintiffs to terminate the IsoLynx-Sportvision Collaboration Agreement, which according to Zebra, would allow Zebra and Plaintiffs to work directly with NFL Enterprises without Sportvision's participation.

306. After Plaintiffs refused to go along with Zebra's scheme to cut Sportvision out of any potential deal with NFL Enterprises, Ms. Stelfox and Zebra continued to allege, without basis, that Plaintiffs had breached Lynx's agreements with ZES. Relying on these unsupported allegations, Zebra purported to terminate ZES's agreements with Lynx and subsequently stopped supplying components that it had been supplying for use in the IsoLynx System, specifically Dart components. Because of Zebra's refusal to supply Dart components under the ZES-Lynx

Solutions Agreement and the ZES-Lynx OEM Agreement (which refusal was intentionally designed to induce a disruption or breach of the contractual relationship between Plaintiffs and Sportvision until Plaintiffs were able to evaluate, test, customize and implement other off-the-shelf components from other RFID equipment suppliers into the IsoLynx System) Plaintiffs could not provide the necessary components for the integrated IsoLynx/Sportvision end-to-end tracking and data generation system contemplated by the IsoLynx-Sportvision Collaboration Agreement.

307. As a result of Zebra's intentional and improper actions, Plaintiffs' business and contractual relationships with Sportvision were terminated in October 2013.

308. As a result of Zebra's intentional interference with Plaintiffs' business and contractual relationships with Sportvision, Plaintiffs have been harmed and Zebra has been unjustly enriched, and Zebra's intentional interference was a substantial factor in causing Plaintiffs' harm and Zebra's unjust enrichment.

**COUNT IV**

**FRAUD**

**(On behalf of Plaintiffs against ZES and ZTC)**

309. Plaintiffs reallege and incorporate by reference paragraphs 1-308 as if fully set forth herein.

310. The statements made by Jill Stelfox on January 29, 2013, to Messrs. Evansen and DeAngelis and identified in paragraphs 173-174 were representations of material fact.

311. The statements made by Jill Stelfox on February 5, 2013 to Mr. Evansen and identified in paragraph 176 were representations of material facts.

312. The statements made by Jill Stelfox on March 29, 2013 to Mr. Evansen and identified in paragraph 219 were representations of material facts.

313. The representations identified in paragraphs 173, 174, 176 and 219 were false and Ms. Stelfox knew that these representations were false when they were made. At the time that Ms. Stelfox made the representations identified in paragraphs 173, 174, 176 and 219, and contrary to these representations, Zebra was engaged in secret discussions with NFL Enterprises for Zebra to provide, without Plaintiffs' participation, a real time player tracking system that used Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how.

314. As the Vice President and General Manager of Zebra's RTLS division, and because of her involvement in the discussions and dealings between Plaintiffs and Zebra with respect to Plaintiffs' trade secrets and other proprietary and confidential information and know-how, Ms. Stelfox knew that Zebra was engaged in discussions with NFL Enterprises for Zebra to provide, without Plaintiffs' participation, a real time player tracking system that used Plaintiffs' trade secrets and other proprietary and confidential information and know-how.

315. At or around the time that Ms. Stelfox made the statements identified in paragraphs 173, 174, 176 and 219, and contrary to her representations to Plaintiffs, Zebra was secretly engaged in the preparation to cut out Plaintiffs from providing a real time player tracking system to the NFL that was based on Plaintiffs' innovations and technologies and to convert and claim as Defendants' own intellectual property Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how disclosed to Zebra in confidence, including seeking to file patent applications on such inventions, trade secrets and other proprietary and confidential information and know-how.

316. The statement made by Anders Gustafsson on May 3, 2013 to Mr. DeAngelis and identified in paragraph 230 was a representation of material fact.

317. The representation identified in paragraph 230 was false and Mr. Gustafsson knew that this representation was false when it was made. At the time that Mr. Gustafsson made the representation identified in paragraph 230 and, contrary to this representation, Zebra was engaged in secret discussions with NFL Enterprises for Zebra to provide, without Plaintiffs' participation, a real time player tracking system that used Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how.

318. As the CEO of ZTC, Mr. Gustafsson knew that Zebra was engaged in discussions with NFL Enterprises for Zebra to provide, without Plaintiffs' participation, a real time player tracking system that used Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how.

319. At or around the time that Mr. Gustafsson made the statement identified in paragraph 230, and contrary to his representation to Plaintiffs, Zebra was secretly engaged in the preparation to cut out Plaintiffs from providing a real time player tracking system to the NFL that was based on Plaintiffs' innovations and technologies and to convert and claim as Defendants' own intellectual property Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how disclosed to Zebra in confidence, including seeking to file patent applications on such inventions, trade secrets and other proprietary and confidential information and know-how.

320. Ms. Stelfox and Mr. Gustafsson made their fraudulent representations, including those identified in paragraphs 173, 174, 176 and 219 and paragraph 230, respectively, intending to make Plaintiffs rely on and believe that Zebra had their best interests in mind and to prevent Plaintiffs from participating in discussions with the NFL until it was too late, and until after Zebra had already installed a real time player tracking system for the NFL without Plaintiffs' involvement.

321. In proceeding with their discussions and dealings with Zebra in the following months, Plaintiffs reasonably relied upon the fraudulent representations made by Defendants, including those by Ms. Stelfox made on January 29, 2013, February 5, 2013 and March 29, 2013 and identified in paragraphs 173, 174, 176 and 219, and those made by Mr. Gustafsson on May 3, 2013 and identified in paragraph 230.

322. Plaintiffs' reasonable reliance on Ms. Stelfox's and Mr. Gustafsson's false representations of material fact caused Plaintiffs to lose out on the business opportunity of providing a real time player tracking system for the NFL and has otherwise damaged Plaintiffs directly and indirectly and monetarily and irreparably.

**COUNT V**

**BREACH OF FIDUCIARY DUTY**

**(On behalf of Plaintiffs against ZES and ZTC)**

323. Plaintiffs reallege and incorporate by reference paragraphs reference paragraphs 1-322 as if fully set forth herein.

324. Plaintiffs and Zebra were engaged in a joint venture or partnership designed to deliver a real-time player tracking system to the NFL. Specifically, Plaintiffs and Zebra were working together whereby Zebra's Dart UWB technology provided information that enabled Plaintiffs' IsoLynx System.

325. As a result of this joint venture or partnership, Plaintiffs and Zebra owed fiduciary duties to each other.

326. Zebra breached the fiduciary duties it owed to Plaintiffs as a co-joint venture or partner by, for example: unlawfully disclosing, using, and otherwise misappropriating Plaintiffs' Protected Information for its own benefit; discussing the installation and operation of a real-time player tracking system with the NFL without Plaintiffs' involvement, knowledge or consent,

while at the same time fraudulently assuring and representing to Plaintiffs that it would not provide a real-time player tracking system to the NFL without Plaintiffs' involvement; and improperly refusing to supply components for use in the IsoLynx System, based on fabricated allegations that wrongfully accused Lynx of breaching agreements that governed the supply of the components.

327. As a result of Zebra's breach of the fiduciary duties it owed to Plaintiffs, Zebra has been unjustly enriched and Plaintiffs have been harmed including at least damages proximately caused by that breach.

## COUNT VI

## UNFAIR METHODS OF COMPETITION AND UNFAIR OR DECEPTIVE ACTS OR PRACTICES UNDER MASSACHUSETTS GENERAL LAW CHAPTER 93A

**(On behalf of Plaintiffs against ZES and ZTC)**

328. Plaintiffs reallege and incorporate by reference paragraphs 1-327 as if fully set forth herein.

329. Zebra is engaged in trade and business, building and providing, among other things, asset tracking technologies.

330. Zebra has engaged in unfair or deceptive acts or trade practices. For example, Zebra has breached the Lynx-ZES Mutual Confidentiality Agreement; enabled ZIH, a wholly owned subsidiary of ZTC, to improperly use Plaintiffs' Protected Information in the filing of patent applications; and executed a scheme, through fabricated allegations of wrongdoing, fraudulent representations, and intentional acts meant to interfere with Plaintiffs' business relationships, whereby it took the IsoLynx System and Plaintiffs' innovations and technologies used in the IsoLynx System for itself without paying and cut out Plaintiffs from the business opportunities with the NFL and others.

331. Zebra's unfair or deceptive acts or trade practices have occurred primarily and substantially in Massachusetts. For example, Zebra's unfair or deceptive acts have been received and acted upon by Plaintiffs in Massachusetts, where Plaintiffs reside and where the development of the IsoLynx System and Plaintiffs' Protected Information took place. The harm and losses caused by Zebra's unfair or deceptive acts have also been incurred in Massachusetts.

332. Zebra has committed its unfair or deceptive acts or trade practices willfully and knowingly.

333. As a result of Zebra's unfair or deceptive acts or trade practices, Plaintiffs have suffered a loss of money or property.

**COUNT VII**

**UNJUST ENRICHMENT**

**(On behalf of Plaintiffs against ZES and ZTC)**

334. Plaintiffs reallege and incorporate by reference paragraphs 1-333 as if fully set forth herein.

335. Plaintiffs confidentially disclosed their Protected Information to Zebra.

336. By disclosing their Protected Information to Zebra, Plaintiffs conferred a benefit upon Zebra.

337. Zebra appreciated and acknowledged the value and benefit of Plaintiffs' Protected Information.

338. Zebra misused Plaintiffs' Protected Information to benefit themselves and at the expense of Plaintiffs. Zebra improperly used and improperly disclosed the Protected Information in a manner not authorized by the Lynx-ZES Mutual Confidentiality Agreement and by state and federal law. Furthermore, Zebra made the Protected Information available without authorization to ZIH, who then incorporated Protected Information related to the IsoLynx System into the

Zebra Provisional Application and falsely asserted that employees of Zebra created, developed and own this Protected Information.

339. Under the circumstances, it would be inequitable for Zebra to retain Plaintiffs' Protected Information without paying Plaintiffs an amount that approximates the value of the benefit conferred upon Defendants.

## COUNT VIII

## CONVERSION

**(On behalf of Plaintiffs against all Defendants)**

340. Plaintiffs reallege and incorporate by reference paragraphs 1-339 as if fully set forth herein.

341. At all times, Plaintiffs have been the rightful and proper owner and possessor of the IsoLynx System, the inventions, trade secrets and other proprietary and confidential information and know-how embodied therein.

342. The IsoLynx System, the inventions, trade secrets and other proprietary and confidential information and know-how embodied therein is Plaintiffs' personal property.

343. By incorporating Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how related to the IsoLynx System into its Zebra MotionWorks™ real-time player tracking system without authorization, Zebra intentionally and wrongfully exercised acts of ownership, control or dominion over Plaintiffs' personal property to which it had no right of possession at the time.

344. By filing patent applications that contain Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how related to the IsoLynx System without identifying Plaintiffs' employees as inventors, Defendants intentionally and wrongfully

exercised acts of ownership, control or dominion over Plaintiffs' personal property to which they had no right of possession at the time.

345. Plaintiffs have been damaged by Defendants' intentional and wrongful exercise of acts of ownership over Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how related to the IsoLynx System.

**COUNT IX**

**INTENTIONAL INTERFERENCE WITH PROSPECTIVE CONTRACTUAL AND ADVANTAGEOUS BUSINESS AND ECONOMIC RELATIONSHIPS**

**(On behalf of Plaintiffs against ZES and ZTC)**

346. Plaintiffs reallege and incorporate by reference paragraphs 1-345 as if fully set forth herein.

347. From 2010 to 2013, Plaintiffs had an advantageous business and economic relationship with the NFL, and specifically NFL Enterprises. Moreover, during this timeframe, Plaintiffs were working toward and had the expectation of an advantageous business relationship whereby Plaintiffs would work with the NFL to install and operate real-time player tracking systems in NFL stadiums for use during NFL games, which would have resulted in economic benefits to Plaintiffs.

348. Zebra knew of Plaintiffs' existing and prospective business and economic relationships with the NFL.

349. Zebra engaged in wrongful conduct including misappropriation of Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how; breach of the Lynx-ZES Mutual Confidentiality Agreement; wrongful termination of the ZES-Lynx Solutions Agreement and the ZES-Lynx OEM Agreement; fraudulent assurance to Plaintiffs that Zebra was not engaged in discussions with the NFL for Zebra to provide a real time player tracking system without Plaintiffs' participation; breach of Zebra's fiduciary duty

owed to Plaintiffs as a result of its joint venture or partnership with Plaintiffs; unfair or deceptive acts or trade practices in violation of Mass. Gen. Laws. Ch. 93A, common law conversion; and common law unjust enrichment.

350. By engaging in its wrongful conduct, Zebra intentionally and improperly interfered with Plaintiffs' existing and prospective business and economic relationships with the NFL, and Zebra knew that the disruption of Plaintiffs' relationships with the NFL was certain or substantially certain to occur.

351. As a result of Ms. Stelfox's April 18, 2013, letter purportedly and wrongfully terminating the ZES-Lynx Solutions Agreement and the ZES-Lynx OEM Agreement, Zebra stopped supplying components that it had been supplying for use in the IsoLynx System, specifically Dart components, pursuant to the ZES-Lynx Solutions Agreement and the ZES-Lynx OEM Agreement.

352. Because of Zebra's wrongful termination and refusal to supply Dart components under the ZES-Lynx Solutions Agreement and the ZES-Lynx OEM Agreement, until Plaintiffs were able to evaluate, test, customize and implement other off-the-shelf components from other RFID equipment suppliers into the IsoLynx System, which is a time-consuming process, Plaintiffs were not able to provide a fully operational IsoLynx System to NFL Enterprises for installation and use during NFL preseason and regular games.

353. Between January and May 2013, Zebra continually and fraudulently assured Plaintiffs that it was not engaged in discussions with the NFL for Zebra to provide, without Plaintiffs' participation, a real time player tracking system that used Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how, all of which was misappropriated by Zebra in a manner not authorized by the Lynx-ZES Mutual Confidentiality Agreement and in a manner not authorized by state law.

354. Between January and May 2013, Zebra was in fact in discussions with the NFL to provide a real time player tracking system, despite the fraudulent assurances it made to Plaintiffs to the contrary.

355. Zebra then, in August 2013 and without Plaintiffs' participation and prior knowledge, was able to install real-time player tracking systems in two NFL stadiums for use during the NFL's 2013 preseason games by using Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how.

356. As a result of Zebra's intentional and improper actions, Plaintiffs' existing and prospective business and economic relationships with the NFL were disrupted and ended in mid-2013.

357. Plaintiffs have been harmed and Zebra has been unjustly enriched as a result of its intentional interference with Plaintiffs' existing and prospective business and economic relationships with the NFL, and Zebra's intentional interference was a substantial factor in causing Plaintiffs' harm and Zebra's unjust enrichment.

**COUNT X**

**CORRECTION OF INVENTORSHIP OF THE '880 PATENT AND THE '485 PATENT PURSUANT TO 35 U.S.C. § 256**

**(On behalf of Plaintiffs against ZIH Corp. and Other Defendants)**

358. Plaintiffs reallege and incorporate by reference paragraphs 1-357 as if fully set forth herein.

359. This is an action under the patent laws of the United States, 35 U.S.C. § 256, seeking correction of inventorship of United States patents by adding rightful and actual inventors as joint inventors.

360. Lynx and IsoLynx, as employers and assignees of intellectual property rights developed by their employees, officers and consultants, have sufficient, concrete economic interest in the correction of the inventorship of U.S. Patents Nos. 8,989,880 and 9,002,485.

361. The ‘880 patent and the ‘485 patent, as well as the applications from which they were issued, claim priority based on the Zebra Provisional Application filed on June 6, 2013.

362. The Zebra Provisional Application, the ‘880 patent and the ‘485 patent incorporate, and the ‘880 and ‘485 patents describe and claim as patentable inventions, Plaintiffs’ proprietary information and know-how related to the IsoLynx System that Plaintiffs disclosed to Zebra under the Lynx-ZES Mutual Confidentiality Agreement. Specifically, in December 2012, Plaintiffs disclosed to Zebra their Automated Play Detection System that used real time information about participant locations to determine formations by comparing the participant data information to formation models. Plaintiffs demonstrated the operation of their Automated Play Detection system to Zebra executives during an actual NFL game between the Miami Dolphins and Buffalo Bills on December 23, 2012. As part of demonstrating the Automated Play Detection System, Plaintiffs disclosed the functions and capabilities of determining formations by comparing the participant location data to formation models. Zebra executives that viewed the operation of the Automated Play Detection System and received the detailed explanation of how it operated included Belinda Turner, Bill Bulzoni and Cynthia Traeger.

363. Plaintiffs’ employees, officers and/or consultants, including Edward G. Evansen, Douglas J. DeAngelis, Gerard M. Reilly and Kirk M. Sigel, contributed significantly to the conception of the inventions claimed and described in the ‘880 patent and the ‘485 patent, and Plaintiffs also communicated to Defendants a definite and permanent idea of their contribution.

364. These inventions are embodied in elements of claims 2, 8, 10 and 15 of the ‘880 patent and claims 1, 8 and 14 of the ‘485 patent, and any claims directly or indirectly dependent thereon, including, without limitation:

> comparing [compare] the participant location data to formation models based at least in part on the participant role data and the field data; and
>
> determining [determine] formation data based on the comparing the participant location data to the formation models.

The same or precisely the same claim elements are also included in claims 4, 55, 94, 99 and 117 of the Zebra Provisional Application.

365. Accordingly, Plaintiffs’ employees, officers and consultants should have been named as joint inventors of the ‘880 patent and ‘485 patent as well as the Zebra Provisional Application to which all of the patents at issue claim priority.

366. Knowing full well that Plaintiffs’ employees, officers and consultants are true joint inventors of the inventions claimed in the patents at issue, neither ZIH nor the other Defendants named, as true joint inventors of the Zebra Provisional Application, the ‘880 patent or the ‘485 patent, any of Plaintiffs’ employees, officers and consultants who made significant contributions to the conception of the inventions of these patents.

367. Pursuant to 35 U.S.C. § 256, an order should issue correcting inventorship of the Zebra Provisional Application, the ‘880 patent and the ‘485 patent and, upon issuance, any other patent issued from any patent application that claims priority to the Zebra Provisional Application and that contains the proprietary information and know-how related to the IsoLynx System developed by Plaintiffs’ employees, officers and consultants. At a minimum, Edward G. Evansen, Douglas J. DeAngelis, Gerard M. Reilly and Kirk M. Sigel should be added to the list of inventors of the ‘880 patent and the ‘485 patent.

**COUNT XI**

**DECLARATION OF UNENFORCEABILITY**

**FOR INEQUITABLE CONDUCT IN PATENT PROCUREMENT**

**(On behalf of Plaintiffs against ZIH and Other Defendants)**

368. Plaintiffs reallege and incorporate by reference paragraphs 1-367 as if fully set forth herein.

369. An actual controversy exists between Plaintiffs and Defendants as to the enforceability of the Zebra Provisional Application, U.S. Application Nos. 13/942,202 and 13/942,244 that claim priority to the Zebra Provisional Application, and the '880 and '485 patents.

370. Plaintiffs, who are employers and assignees of intellectual property rights developed by their employees, officers and consultants, have sufficient, concrete economic interest in the Zebra Provisional Application, Application Nos. 13/942,202 and 13/942,244, and the '880 and '485 patents, and have suffered harm as a result of the inequitable conduct by ZIH and other Defendants in the procurement thereof.

371. Plaintiffs seek a declaration that the Zebra Provisional Application, Application Nos. 13/942,202 and 13/942,244, and the '880 and '485 patent are unenforceable for inequitable conduct in the procurement thereof.

372. ZIH, together with other Defendants, knowingly misrepresented material information to the USPTO relating to the inventorship of the Zebra Provisional Application, Application Nos. 13/942,202 and 13/942,244, and the '880 and '485 patents.

**Automated Play Detection System**

373. In December 2012 under the IsoLynx-ZES Mutual Confidentiality Agreement, Plaintiffs disclosed to Zebra their Automated Play Detection System that used the real time

information about participant locations to determine formations by comparing the participant location data to formation models. Plaintiffs demonstrated the operation of their Automated Play Detection system to Zebra executives during an actual NFL game between the Miami Dolphins and Buffalo Bills on December 23, 2012. As part of demonstrating the Automated Play Detection System, Plaintiffs disclosed the functions and capabilities of determining formations by comparing the participant location data to formation models. Zebra executives that viewed the operation of the Automated Play Detection System and received the detailed explanation of how it operated included Belinda Turner, Bill Bulzoni and Cynthia Traeger.

374. On June 6, 2013, one day after delivery of Plaintiff's letter to Defendants' Vice President and General Counsel, Jim Kaput, regarding Plaintiffs' inventions, trade secrets and other proprietary and confidential information and know-how and Defendants' obligations not to use or exploit them, ZIH filed the Zebra Provisional Application. The Zebra Provisional Application incorporates inventions, trade secrets and other proprietary and confidential information and know-how invented by Plaintiffs' officers, employees and/or agents.

375. The Zebra Provisional Application identifies, as inventors, Zebra personnel who had direct access to Plaintiffs' Automated Play Detection System, including Cynthia Traeger and Belinda Turner.

376. Nine days after filing the Zebra Provisional Application, ZIH filed U.S. patent application number 13/942,567, titled, "Performance Analytics Based on Real-Time Data For Proximity And Movement of Objects" ("Application No. 13/942,567"). ZIH filed Application No. 13/942,567 through its patent attorney Brian C. Ellsworth (Patent Reg. No. 50,813). Application No. 13/942,567 ultimately issued as the '880 patent on March 24, 2015, listing ZIH as the assignee and naming three inventors: Michael A. Wohl, James J. O'Hagan and Wolfgang Strobel ("the '880 Named Inventors").

377. The '880 patent claims priority to the Zebra Provisional Application, and contains claims directed to determining formations based on comparing the participant location data with formation models. Specifically, claims 2, 8, 10 and 15 of the '880 patent, and any claims directly or indirectly dependent thereon, contain the following claim elements:

> comparing [compare] the participant location data to formation models based at least in part on the participant role data and the field data;
>
> determining [determine] formation data based on the comparing the participant location data to the formation models

The same or precisely the same claim elements are also included in claims 4, 55, 94, 99 and 117 of the Zebra Provisional Application.

378. Edward G. Evansen, Douglas J. DeAngelis, Gerard M. Reilly and Kirk M. Sigel, are joint inventors of at least claims 2, 8, 10 and 15 of the '880 patent, and any claims directly or indirectly dependent thereon, based on their contributions to the conception of those claims and their communication to Defendants of a definite and permanent idea of their contribution. Edward G. Evansen, Douglas J. DeAngelis, Gerard M. Reilly and Kirk M. Sigel are all obligated and required to assign any inventions that they invent in connection with their work at Lynx/IsoLynx to Plaintiffs.

379. During July 2013, the '880 Named Inventors, at the request and direction of Zebra, fraudulently signed inventorship oaths asserting that they were the original and joint inventors of the subject matter claimed in the application resulting in the issuance of the '880 patent.

380. Zebra fraudulently concealed naming Edward G. Evansen, Douglas J. DeAngelis, Gerard M. Reilly and Kirk M. Sigel as inventors of the '880 patent because it wanted to own the '880 patent outright and did not want to share an undivided ownership interest in the '880 patent with Plaintiffs, who would have such an ownership interest based on Edward G. Evansen's,

Douglas J. DeAngelis', Gerard M. Reilly's and Kirk M. Sigel's contributions and their obligations to assign their inventions to Plaintiffs.

381. On the same day ZIH filed U.S. patent application number 13/942,567, ZIH also filed U.S. patent application number 13/942,316 through its patent attorney Brian C. Ellsworth (Patent Reg. No. 50,813). Application No. 13/942,316 ultimately issued as the '485 patent on April 7, 2015, listing ZIH as the assignee and naming five inventors: Michael A. Wohl, James J. O'Hagan, Anthony R. Brown, Wolfgang Strobel and Dean Lodwig ("the '485 Named Inventors").

382. The '485 patent claims priority to the Zebra Provisional Application, and contains claims directed to determining formations based on comparing the participant location data with formation models. Specifically, claims 1, 8 and 14 of the '485 patent, and any claims directly or indirectly dependent thereon, contain the following claim elements:

> comparing [compare] the participant location data to formation models based at least in part on the participant role data and the field data;
>
> determining [determine] formation data based on the comparing the participant location data to the formation models

The same or precisely the same claim elements are also included in claims 4, 55, 94, 99 and 117 of the Zebra Provisional Application.

383. Edward G. Evansen, Douglas J. DeAngelis, Gerard M. Reilly and Kirk M. Sigel are joint inventors of at least claims 1, 8, and 14 of the '485 patent, and any claims directly or indirectly dependent thereon, based on their contributions to the conceptions of these claims and their communication to Defendants of a permanent idea of their contribution. Edward G. Evansen, Douglas J. DeAngelis, Gerard M. Reilly and Kirk M. Sigel are obligated and required to assign to Plaintiffs any inventions that they invent in connection with their work at or with Plaintiffs.

384. During July 2013, the ‘485 Named Inventors, at the request and direction of Zebra, fraudulently signed inventorship oaths asserting that they were the original and joint inventors of the subject matter claimed in the application resulting in the issuance of the ‘485 patent.

385. Zebra fraudulently concealed naming Edward G. Evansen, Douglas J. DeAngelis, Gerard M. Reilly and Kirk M. Sigel as inventors of the ‘485 patent because it wanted to own the ‘485 patent outright and did not want to share an undivided ownership interest in the ‘485 patent with Plaintiffs, who would have such an ownership interest based on Edward G. Evansen’s, Douglas J. DeAngelis’, Gerard M. Reilly’s and Kirk M. Sigel’s contributions and their obligations to assign their inventions to Plaintiffs.

386. Zebra also fraudulently concealed naming Edward G. Evansen, Douglas J. DeAngelis, Gerard M. Reilly and Kirk M. Sigel as inventors on the Zebra Provisional Application because it wanted to own any patents issuing therefrom outright and did not want to share an undivided ownership interest in any such patents with Plaintiffs, who would have such an ownership interest based on Edward G. Evansen’s, Douglas J. DeAngelis’, Gerard M. Reilly’s and Kirk M. Sigel’s contributions and their obligations to assign their inventions to Plaintiffs.

387. As a critical requirement for obtaining a patent, inventorship is material, and the intentional falsehoods and omissions by Zebra regarding inventorship are affirmative egregious conduct that cannot be cured, rendering any patents issuing from the Zebra Provisional Application, and the ‘880 patent and the ‘485 patent, unenforceable for inequitable conduct.

**Notch Filtering for Immunizing Against Interferers**

388. In July 2012 under the IsoLynx-ZES Mutual Confidentiality Agreement, Plaintiffs disclosed their solution to use notch filters in addition to, or instead of, band pass filters to combat interferers in specific game day environments. The notch filter solution was invented by

Alexander T. Farkas, a consultant to Plaintiffs. Plaintiffs disclosed and described the notch filter solution in an email chain between Ed Evansen (Lynx/IsoLynx) and Ed Richley, Belinda Turner and Bill Bulzoni (Zebra) dated July 17-18, 2012.

389. On June 6, 2013, ZIH filed the Zebra Provisional Application. The Zebra Provisional Application incorporates a tunable notch filter invented by Plaintiffs' principals, employees and/or agents. The Zebra Provisional Application identifies, as inventors, Zebra personnel who had direct access to Plaintiffs' tunable notch filter, including at least Ed Richley.

390. On July 15, 2013, ZIH filed U.S. patent application number 13/942,202, titled, "Multiple Antenna Interference Rejection in Ultra-Wideband Real Time Locating Systems" ("Application No. 13/942,202"). ZIH filed Application No. 13/942,202 through its patent attorney Brian C. Ellsworth (Patent Reg. No. 50,813). Application No. 13/942,202 published as U.S. Patent Application Publication US 2014/0362892 A1 on December 11, 2014, listing ZIH as the assignee and naming Edward A. Richley as the sole inventor ("the US2014/0362892 Named Inventor").

391. Application No. 13/942,202 claims priority to the Zebra Provisional Application, and contains claims directed to adjusting filtering using a tunable notch filter. Specifically, claim 8 and 11 of US2014/0362892, and any claims directly or indirectly dependent thereon, are directed to a method of providing interference rejection and contain the following claim element:

> wherein adjusting filtering of the composite signal comprises attenuating the component of the composite signal using a tunable notch filter.

The same or precisely the same claim element is included in claim 13, and any claims directly or indirectly dependent thereon, of Exhibit A of the Zebra Provisional Application.

Claim 17 of US2014/0362892, and any claims directly or indirectly dependent thereon, are directed to an apparatus comprising [sic] for providing interference rejection and contains the following claim element:

> cause the apparatus to attenuate the component of the composite signal using a tunable notch filter.

392. On July 15, 2013, ZIH also filed U.S. patent application number 13/942,244, titled, "Interference Rejection in Ultra-Wideband Real Time Locating Systems" ("Application No. 13/942,244"). ZIH filed Application No. 13/942,244 through its patent attorney Brian C. Ellsworth (Patent Reg. No. 50,813). Application No. 13/942,244 published as U.S. Patent Application Publication US 2014/0364078 A1 on December 11, 2014, listing ZIH as the assignee and naming Edward A. Richley as the sole inventor ("the US2014/0364078 Named Inventor").

393. Application No. 13/942,244 claims priority to the Zebra Provisional Application, and contains claims directed to filtering using a tunable notch filter. Specifically, claim 1 of US2014/0364078, and any claims directly or indirectly dependent thereon, are directed to a Ultra-Wideband receiver and contain the following claim element:

> a tunable notch filter configured to attenuate a part of the composite signal representing the interference signal thereby generating a filtered signal.

The same or precisely the same claim element is included in claim 5, and any claims directly or indirectly dependent thereon, of Exhibit A of the Zebra Provisional Application.

Claim 6 of US2014/0364078, and any claims directly or indirectly dependent thereon, are directed to a method of providing interference rejection and contain the following claim element:

> filtering at least a first component of the composite signal representing the interference signal with a tunable notch filter to generate a filtered signal.

The same or precisely the same claim element is included in claim 9, and any claims directly or indirectly dependent thereon, of Exhibit A of the Zebra Provisional Application.

394. Alexander T. Farkas is a joint inventor of at least claims 8, 11 and 17 of US2014/0362892, claims 1 and 6 of US2014/0364078 and claims 5, 9 and 13 of Exhibit A of the Zebra Provisional Application, and any claims directly or indirectly dependent thereon, based on his contributions to the conceptions of these claims and his communication to Defendants of a permanent idea of their contribution. Mr. Farkas was and remains obligated and required to assign any inventions that he invents in connection with his work at or with Lynx/IsoLynx to Plaintiffs.

395. During July 2013, the US2014/0362892 Named Inventor and the US2014/0364078 Named Inventor, at the request and direction of Zebra, fraudulently signed inventorship oaths asserting that he was the original and sole inventor of the subject matter claimed in the applications resulting in those published applications.

396. Zebra fraudulently concealed naming Alexander T. Farkas as an inventor of the Zebra Provisional Application and Applications Nos. 13/942,202 and 13/942,244 because it wanted to own any patents issuing therefrom outright and did not want to share an undivided ownership interest in any such patents with Plaintiffs, who would have such an ownership interest based on Mr. Farkas' contributions and his obligations to assign his inventions to Plaintiffs.

397. As a critical requirement for obtaining a patent, inventorship is material, and the intentional falsehoods and omissions by Zebra regarding inventorship are affirmative egregious conduct that cannot be cured, rendering any patents issuing from the Zebra Provisional Application and Application Nos. 13/942,202 and 13/942,244 unenforceable for inequitable conduct.

**User Interface Features of IsoTools and Who's On The Field (WOTF) Software**

398. In February 2012 under the IsoLynx-ZES Mutual Confidentiality Agreement, Plaintiffs disclosed to Zebra their IsoTools install/test/debug software and their Who's On The Field (WOTF) software. Plaintiffs' IsoTools install/test/debug and WOTF software is an important part of the IsoLynx System. Plaintiffs disclosed and described their IsoTools install/test/debug and WOTF software, including their user interface features, to Defendants' employees, including Belinda Turner and Bill Bulzoni, at least during a February 21, 2012 meeting at Plaintiffs' offices.

399. Under the IsoLynx-ZES Mutual Confidentiality Agreement, Plaintiffs, through Brian Rhodes and Joseph Gaudreau, further disclosed the IsoTools install/test/debug and WOTF software including their user interface features in a February 28, 2012 Web Demo to Belinda Turner.

400. On June 4, 2013, IsoLynx' counsel wrote to Zebra requesting that it destroy and no longer use IsoLynx confidential information and intellectual property, including, among other things identified, the software tools for installing, diagnosing and optimizing UWB Real Time Location System in sporting venues, and Software tools for managing the team/player/tag/settings relationships in a sporting application.

401. On June 6, 2013, ZIH filed the Zebra Provisional Application. The Zebra Provisional Application incorporates user interface features of the IsoTools install/test/debug and WOTF software invented by Plaintiffs' principals, employees and/or agents. The Zebra Provisional Application identifies, as inventors, Zebra personnel who had direct access to Plaintiffs' user interface features of the IsoTools install/test/debug and WOTF software, including at least Belinda Turner.

402. At least claims 1-38 of Exhibit D of the Zebra Provisional Application, and any claims directly or indirectly dependent thereon, are directed to user interface features of the IsoTools install/test/debug and WOTF software.

403. Douglas DeAngelis, Edward G. Evansen, Joseph Gaudreau, Gerard M. Reilly, Brian Rhodes and Kirk Sigel are joint inventors of at least claims 1-38 of Exhibit D of the Zebra Provisional Application, and any claims directly or indirectly dependent thereon, based on their contributions to the conceptions of these claims and their communication to Defendants of a permanent idea of their contribution. Douglas DeAngelis, Edward G. Evansen, Joseph Gaudreau, Gerard M. Reilly, Brian Rhodes and Kirk Sigel are obligated and required to assign any inventions that they invent in connection with their work at Lynx/IsoLynx to Plaintiffs.

404. Zebra fraudulently concealed naming Douglas DeAngelis, Edward G. Evansen, Joseph Gaudreau, Gerard M. Reilly, Brian Rhodes and Kirk Sigel as inventors of the Zebra Provisional Application because it wanted to own any patents issuing therefrom outright and did not want to share an undivided ownership interest in any such patents with Plaintiffs, who would have such an ownership interest based on Douglas DeAngelis, Edward G. Evansen, Joseph Gaudreau, Gerard M. Reilly, Brian Rhodes and Kirk Sigel's contributions and their obligations to assign their inventions to Plaintiffs.

405. As a critical requirement for obtaining a patent, inventorship is material, and the intentional falsehoods and omissions by Zebra regarding inventorship are affirmative, egregious conduct that cannot be cured rendering any patents issuing from the Zebra Provisional Application unenforceable for inequitable conduct.

## COUNT XII

## DECLARATION OF OWNERSHIP OF PATENTS

**(Plaintiffs against all Defendants)**

406. Plaintiffs reallege and incorporate by reference paragraphs 1-405 as if fully set forth herein.

407. An actual controversy exists between Plaintiffs on one hand and ZIH and other Defendants on the other hand as to inventorship and ownership of the ‘880 and ‘485 patents, Application Nos. 13/942,202 and 13/942,244, and the Zebra Provisional Application.

408. Plaintiffs’ employees, officers and consultants, namely, Douglas DeAngelis, Edward G. Evansen, Alexander T. Farkas, Joseph Gaudreau, Gerard M. Reilly, Brian Rhodes and Kirk Sigel, contributed significantly to the conception of one or more of the inventions claimed and described in the ‘880 and ‘485 patents, Application Nos. 13/942,202 and 13/942,244, and the Zebra Provisional Application, and Plaintiffs also communicated a definite and permanent idea of their contributions to such inventions claimed and in the ‘880 and ‘485 patents, Application Nos. 13/942,202 and 13/942,244, and the Zebra Provisional Application. Accordingly, Plaintiffs’ employees, officers and consultants are actual and joint inventors of the ‘880 and ‘485 patents, Application Nos. 13/942,202 and 13/942,244, and the Zebra Provisional Application, and they are all obligated to assign their inventions to Plaintiffs.

409. Plaintiffs are entitled to a declaration that Plaintiffs are a legal and equitable co-owner of the '880 and ‘485 patents, Application Nos. 13/942,202 and 13/942,244, and the Zebra Provisional Application, and an order directing ZIH to execute any and all necessary documents to confirm and memorialize Plaintiffs’ legal and equitable ownership of the '880 and ‘485 patents, Application Nos. 13/942,202 and 13/942,244, and the Zebra Provisional Application.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ask this Court to enter judgment against ZES, ZTC, and ZIH and each of their parents, subsidiaries, affiliates, agents, servants, employees and all entities in active concert or participation with them, granting the following relief:

a) Compensatory damages (including Plaintiffs' lost profits and consequential damages, disgorgement of Defendants' ill-gotten profits, Defendants' unjust enrichment, payment of a reasonable royalty and/or reliance damages) in an amount to be determined at trial, with interest;

b) Enhanced and punitive damages as permitted by law, including Mass. Gen. L. ch. 93A;

c) A permanent injunction enjoining and restraining each of the Defendants and their parents, subsidiaries, affiliates, agents, servants, employees, and all entities in active concert or participation with them, from using Plaintiffs' Protected Information, including inventions, trade secrets and other proprietary and confidential information and know-how, in and related to the Zebra MotionWorks™ system, any similar sports tracking offerings provided by or for Zebra, and any patents and patent applications;

d) An order directing Defendants to permanently remove all Zebra MotionWorks™ installations and any similar sports tracking systems provided by or for Zebra, including but not limited to any MotionWorks™ installations in NFL stadiums;

e) Any and all equitable relief that may be available to Plaintiffs, including without limitation restitution, disgorgement, or the imposition of a constructive trust;

f) A declaration that Douglas DeAngelis, Edward G. Evansen, Gerard M. Reilly and Kirk Sigel are joint inventors of the '880 patent and the '485 patent;

g) An order directing the Commissioner of the USPTO to issue a Certificate of Correction for the '880 patent and the '485 patent attesting to the fact that Douglas DeAngelis,

Edward G. Evansen, Gerard M. Reilly and Kirk Sigel were omitted as joint inventors on the '880 patent and the '485 patent and correcting that error by including each of Douglas DeAngelis, Edward G. Evansen, Gerard M. Reilly and Kirk Sigel as inventors on those patents;

h) A declaration that Plaintiffs are the legal and equitable co-owners of the '880 patent, the '485 patent, Applications Nos. 13/942,202 and 13/942,244 and the Zebra Provisional Application;

i) Alternatively, a declaration that the '880 patent, the '485 patent, any patents issuing from any of Applications Nos. 13/942,202 and 13/942,244 and/or the Zebra Provisional Application are unenforceable for inequitable conduct in the procurement thereof;

j) Costs and reasonable attorneys' fees, as permitted by law; and

k) Such other and further relief as the Court deems just and reasonable.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

s/ William A. Scofield, Jr.
William A. Scofield, Jr. (BBO# 448940)
(wscofield@lathropgage.com)
LATHROP & GAGE LLP
28 State Street
Boston, Massachusetts 02109
Phone: 857.300.4032
Facsimile: 857.300.4001

David J. Sheikh (dsheikh@leesheikh.com)
Christopher J. Lee (clee@leesheikh.com)
Richard B. Megley, Jr.
(rmegley@leesheikh.com)
Brian E. Haan (bhaan@leesheikh.com)
Joseph A. Culig (jculig@leesheikh.com)
LEE SHEIKH MEGLEY & HAAN
1 North Franklin Street, Suite 3340
Chicago, Illinois 60606
Phone: 312.982.0070
Facsimile: 312.982.0071

***Counsel for Lynx System Developers, Inc. and IsoLynx, LLC***